UNITED STATES of America

v.

Augustine FERRONE, Appellant.

No. 18777.

United States Court of Appeals,
Third Circuit.

Argued Nov. 5, 1970.

Decided Feb. 17, 1971.

382

Samuel J. Reich, Cooper, Schwartz, Diamond & Reich, Pittsburgh, Pa., for appellant.

Richard L. Thornburgh, U. S. Atty., Pittsburgh, Pa. (Douglas D. McBroom, Asst. U. S. Atty., Pittsburgh, Pa., on the brief), for appellee.

Before BIGGS, VAN DUSEN and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

Appellant was indicted on November 15, 1967 by a federal grand jury on three counts charging him with forcibly assaulting, resisting and opposing agents of the Internal Revenue Service in the performance of their official duties[1] and four additional counts charging violations of the federal Wagering Tax laws.[2] Following the Supreme Court's decisions in Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968) and Grosso v. United States, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968), the government abandoned its case on the four latter counts. Appellant was convicted by a jury on all three assault and resistance counts on January 20, 1970. This appeal followed.

### I

The alleged assaults and resistance took place on May 5, 1967 while three agents of the Internal Revenue Service (IRS) were attempting to execute two search warrants, one for appellant's apartment, the other (a "John Doe" warrant) for his person. These searches were part of a larger investigation of gambling activity in the Pittsburgh area. The warrants in question were issued by the United States Commissioner on the basis of a twenty-four page "master affidavit," signed by an IRS Special Agent, which served as the basis for warrants for several other locations as well. The affidavit recited that the IRS had obtained through civil summonses[3] telephone company toll slips which showed the destinations of calls placed on phones registered at the approximately fourteen locations under suspicion. This data, covering a period of six months and set out at length in the affidavit, showed a pattern of frequent communication among certain telephones in the Pittsburgh area. Most of those phones were registered in the names of persons with a history of gambling offenses. The agents did not know appellant's identity until after the search warrants were executed and he was in custody. Thus, the two pages of the affidavit dealing specifically with appellant's apartment begin "XII. 412–824–8148 (Subscribed to by Mrs. F. Lancer (a fictitious name), Apt. 4–C, 1806 Patricia Lane 412–824–5450 East McKeesport, Pennsylvania)." There followed telephone data on incoming and outgoing calls which linked appellant's phone to phones at three other suspected locations.[4] The affidavit went on to say:

> On November 15, 1966, a confidential informant whom Special Agent Vernon B. Carpenter regards as unquestionably reliable with regards (sic) to wagering and bookmaking operations and information told Special Agent Carpenter that an unidentified white male was accepting a lot of sporting

1. See 18 U.S.C. Sections 111 and 1114.

2. Specifically, two counts charged violations of 26 U.S.C. Section 7203 and two charged violations of 26 U.S.C. Section 7262.

3. See 26 U.S.C. Section 7602.

4. These three phones were registered to:
 (a) M. Petro. Appellant had made approximately 63 calls to Petro. Petro, in turn, had made some 380 to appellant. (All these figures represent a six-month period.) A special agent had visited Petro's tavern and observed extensive wagering activity.
 (b) L. Ciancutti, to whom appellant had made six calls and from whom he had received 142. Ciancutti had, during this six month period, also placed 166 calls to a convicted gambler in Williamsport. The affidavit also stated that "(i) information has been received that Louis Ciancutti is engaged in the business of accepting sports wagers."
 (c) Frank Wolfrom, whose roommate William Medicino had several gambling convictions to his credit. Some 13 calls had been placed to appellant's phone from this number.
 There had also been many calls between this phone and that of one Robert Thompson, who had been convicted of gambling in 1959.

bets on telephone #824–5450 (one of appellant's phones). On May 2, 1967, this same confidential informant stated that an unidentified white male of Italian descent was still engaged in accepting a lot of sporting bets on telephone #824–5450. This confidential informant has supplied Special Agent Carpenter with considerable information in the past relative to wagering operation which has proven to be reliable and accurate.

At approximately 3:05 P.M., on April 28, 1967, Special Agent John J. Kish observed a white male with black wavy hair and stocky build looking out the window of Apt. 4–C, 1806 Patricia Lane, East McKeesport, Pennsylvania. At 3:50 P.M., Special Agent Kish observed the aforementioned white male sitting in Apt. 4–C and talking on the telephone.

Special Agents Kish, Martin, and Ziemba were assigned to execute the warrants. They arrived outside appellant's apartment at 1:15 P.M., Agents Kish and Martin knocked on the apartment door at 1:30 P.M., identified themselves in a loud voice, and stated their purpose. By pre-arrangement, Agent Ziemba remained outside looking in the bedroom window. The door was not answered promptly. Following a futile attempt by Agent Martin to break down the door, it was opened by Sally Yenchi, a friend of the Ferrones. Immediately upon entering, Kish and Martin heard a toilet flush. They rushed to the bathroom where they saw appellant standing over the toilet. The agents brushed him aside, and Agent Martin retrieved two baseball "line sheets" from the toilet bowl.

Appellant was then confronted by the two agents in the hallway outside the bathroom. Agent Kish, the spokesman, identified himself and Martin as IRS special agents and displayed his badge. Agent Martin was wearing his badge on his breast pocket. Kish did not show his credentials, however, since he did not have them in his possession. Appellant seemed excited and angry and was yelling at the top of his voice. Finally, in response to Kish's repeated statements that he had warrants, appellant said, "Where are the warrants? I want to see the warrants." Kish left appellant's presence to procure the warrants from his briefcase in the living room. While Kish was gone, appellant went to the bedroom, where the phones were located. Agent Martin followed him. Agent Ziemba observed this movement, entered the apartment, and went to the bedroom. Agent Kish then entered the bedroom with the John Doe warrant. The appellant asked permission to call his attorney. Kish replied that he could call his attorney after the search warrant was read.

As Agent Kish began to read the warrant, appellant grabbed it from his hand, crumpled it and threw it to the floor, pushing Agent Kish in the process. Appellant then turned and lunged at Agent Martin in an apparent attempt to reach the telephone or the telephone wires. Appellant and Agent Martin grappled on the floor. In the struggle, appellant pulled at the wires leading from the wall transformer to the telephones. Agent Ziemba pulled in the opposite direction.[5] Agent Kish joined in the struggle to subdue the appellant. During the struggle, the appellant kicked and elbowed all three agents. He was finally subdued by Agent Kish who struck him two blows on the head with his blackjack.

Appellant was then handcuffed and taken to the kitchen, where he had to be restrained once again as he tugged at a wall-phone extension located there. While the agents and appellant were in the kitchen, the phone rang several times. Agent Ziemba answered the phone. Each time he picked up the receiver, appellant shouted, "Don't tell them anything. I have been hit. I have been hit."

---

5. At the trial, appellant testified that he was trying to call for help. Agent Ziemba, on the other hand, testified that appellant was trying to pull the wires out of the wall in order to render the phones inoperative.

Eventually, both search warrants were executed and certain items relating to wagering activities were seized. Soon thereafter, the local police arrived, having been summoned either by appellant's wife or Sally Yenchi.[6] Later still, the appellant was placed under arrest for forcibly resisting and assaulting the agents.

Testifying in his own behalf, appellant admitted he was engaged in wagering activities. At the time of the raid, his wife told him there were Internal Revenue Agents at the door. He tried to dispose of the line sheets in the toilet because he "didn't want to embarrass anybody." He testified that certain things about the agents caused him to suspect that they might be robbers—their manner of dress,[7] that Agent Kish had no credentials, the way Agent Kish put him off when he asked to call his attorney, and the suspicious nature of a "John Doe" warrant. He further testified that the struggle began when he attempted to reach the telephone to call for help and that it was not until he was recuperating on the couch from his blackjack wounds and observed that he was handcuffed that he came to the conclusion that these men actually were law enforcement officers.

## II

Appellant first assigns as error that he was unfairly prejudiced by the opening remarks of the prosecuting attorney and by the admission of the testimony of Special Agent Carpenter, who was in charge of the entire investigation. In each instance, appellant complains of references to his being involved in a "large-scale interstate wagering operation." [8]

■■ In evaluating this contention, we must first decide whether admission of *any* evidence of appellant's gambling activities was proper. We hold that it was. That the agent be engaged "in or on account of the performance of his official duties" is an essential element of the offense for which the appellant was

---

6. Both women testified that appellant had yelled to them during his confrontation with the agents to call the police. The agents testified that they heard no such request.

7. Agent Kish was wearing a dark blue wind-breaker and a red banlon sweater. Agent Martin was wearing an old plaid sports jacket over a sports shirt. Agent Ziemba was wearing a jacket over a colored sports shirt.

8. The prosecutor's opening statement included the following:

You will hear from these agents that an intensive investigation was being conducted in the spring of 1967 into allegations of large-scale interstate wagering activities which violated the statute then on the books about which I spoke to you this morning.
* * * You will hear from these agents the precise mode in which they set up their plans for making a careful examination of a number of premises, a number of houses, a number of dwellings, a number of apartments and business establishments throughout the greater Pittsburgh area where it was suspected that this alleged wide-spread interstate illegal gambling was being carried on.

* * * You will hear the agents describe how they were able to connect this specific premises with the investigation that they were carrying on.

The relevant portions of Agent Carpenter's testimony on direct examination are as follows:

Q. Would you explain to the jury some of the activities that you undertook in connection with that investigation, particularly as they relate to the eventual identification of 1806 Patricia Drive? (Objection by Appellant's counsel. Overruled.)

A. I received information that the suspected wagering operation in Las Vegas, Nevada was transmitting calls to a location in Pittsburgh, Pennsylvania here. I obtained toll slips relating to this location and saw there were many calls going to other locations within the Pittsburgh area.

* * * * *

* * * And as I examined the toll slips from these various telephones, they expanded to include other telephones until I received some telephone toll slips which had numerous calls to telephone numbers 824–5450 and I believe 8248 which are both located in apartment 4C at 1806 Patricia Lane.

convicted.[9] Thus, it was proper for the prosecution to introduce evidence showing that the agents were engaged in the performance of IRS duties in searching the appellant's home and person.[10] It would appear, however, that the references to Las Vegas and interstate gambling activities, both in the prosecutor's remarks and Agent Carpenter's testimony, were unnecessary for this purpose. We are not convinced, however, that they were prejudicial.

■ In the first place, appellant freely admitted that he was engaged in gambling activity. It is difficult to see how the jury could have been influenced in any significant way by added references to the interstate overtones of the investigation. Secondly, even if this testimony and the prosecutor's remarks had been entirely excluded, we do not believe the jury could have reached any other conclusion as to the appellant's guilt. Appellant contends that this was a very close case on its facts. Based on our own careful reading of the record, we disagree. His principal defense was that he acted under the misapprehension that these agents were robbers, not lawmen. His behavior, at the time, however, was inconsistent with his present posture. He crumpled the warrant and threw it to the floor. He attempted to pull the phones out of the wall. He also yelled warnings to callers whenever Agent Ziemba picked up a ringing phone. Each of these acts took place after the point in time when appellant claims he became suspicious of the agents' identities. Independent of the opening remarks of the prosecution and of the evidence of which he complains, the proof of appellant's guilt was overwhelming. If there was error here, it was harmless and may be disregarded. Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

■ Appellant also contends he was prejudiced by the mention of a "confidential informant" in both the prosecutor's opening statement and Agent Carpenter's testimony, and by the detailing of the information given. Appellant contends, alternatively, that the Government should have been compelled to divulge the identity of the informant. As to appellant's first contention, we hold that the confidential information was admissible as proper background material. Furthermore, a review of Agent Carpenter's testimony reveals that the informant merely volunteered the general information that appellant was "accepting wagers" over the telephone, an activity which appellant freely admitted. There was therefore no opportunity for prejudice here. It follows that no purpose would have been served by requiring the Government to divulge the identity of the informant. The identity of an informant must be divulged only "(w)here the disclosure of (his) identity or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause * * *" Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed. 2d 639 (1957). This is not the case

9. 18 U.S.C. § 111 provides:
"Whoever forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of his official duties, shall be fined not more than $5,000 or imprisoned not more than three years, or both."

10. It is clear from the discussion in chambers concerning the questions to be asked the jury panel on voir dire that both parties in this case assumed from the *outset* that the fact that appellant was engaged in wagering activities had *some* proper place in this case. Defendant's proposed interrogatories included the following two:
(4) Do you believe that gambling or engaging in gambling as a livelihood is morally wrong?
(5) Do you believe that a person who gambles or engages in gambling is less likely to tell the truth than any other witness?
It should also be noted that appellant, on both direct and cross-examination, testified freely as to his gambling activities.

here. Appellant's contentions are therefore without merit.

### III

The remaining assignments of error raised by the appellant pertain to matters arising out of the execution of the search warrants, related seizure of evidence, and the court's charge to the jury on the lawfulness of the search.

Appellant contends that evidence seized in the execution of the two warrants should not have been admitted at trial. He argues (1) that the searches were violative of the provisions of the Fourth Amendment, and (2) that, because the warrants were based on alleged violations of the Wagering Tax Laws, the admission of the seized evidence violated his Fifth Amendment right against self-incrimination. Were appellant's only complaint that the evidence seized in these searches ought to have been suppressed, we would have no need to go into the merits of these contentions, since a review of the record has convinced us beyond a reasonable doubt that he was not prejudiced by the admission into evidence of the results of the search.[11] Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

Appellant has raised an issue beyond the mere admissibility of the seized evidence, however, which requires us to consider in some detail whether or not the search was in conformity with Fourth Amendment standards. He contends that he had a right to resist arrest because the searches were unlawful. He argues that it was error, therefore, for the court to refuse to charge, as appellant requested, that the searches were unlawful and that it was for the jury to determine whether appellant used rea-

sonable force in resisting the execution of the search warrants. This assignment of error rests on two grounds:

(1) since a person may resist an unlawful arrest, and since restraint of a person for the purpose of executing a search warrant on his person is a "technical arrest," the court's refusal to charge as requested by appellant deprived appellant of a valid defense; (2) even if this theory should not have been submitted to the jury, appellant was nonetheless prejudiced by the Court's affirmative instruction that the agents were acting lawfully.

#### The Lawfulness of the Searches

Appellant cites three grounds for his Fourth Amendment argument:

(1) The affidavit in support of the search warrants is insufficient.

(2) The John Doe search warrant for the person is invalid because the description of the person is insufficient.

(3) The agents exceeded the scope of the search warrants by answering telephone calls made to defendant's premises.

█ █ The affidavit established probable cause for the issuance of the warrants. Obviously, the heart of the probable cause is the telephone records. Appellant attacks the govermnment's procurement of these records by means of a Section 7602 civil summons on the grounds that the summons was issued for an improper (i. e., criminal) purpose. This court held in United States v. DeGrosa, 405 F.2d 926 (3d Cir. 1969) that the summons will be considered valid unless the taxpayer *negatives the existence of a proper civil purpose.* This the appellant has clearly failed to do. Indeed,

---

11. Introduced into evidence were the returns for the two search warrants listing the items seized. These included the two baseball line sheets rescued from the toilet, twenty-eight score sheets, two slips of paper inscribed with telephone numbers, and various unspecified sheets of paper, cards, booklets, and bank envelopes. These relatively innocuous items

could have proved no more than what appellant freely admitted throughout the trial—that he was engaged in wagering activities at Apartment 4–C. This evidence, therefore, could not have influenced the jury to reach a verdict adverse to appellant on the assault and resistance charges.

all the affirmative evidence indicates that there may have been a proper civil purpose.[12] The burden was on the appellant to prove otherwise. DiPiazza v. United States, 415 F.2d 99 (6th Cir. 1969).

Appellant also attacks the affidavit on *Aguilar-Spinelli* grounds.[13] He argues that the telephone toll slips provide probable cause to believe there was wagering activity being conducted in his apartment, but *only* for the period covered by the toll slips, i. e., September 25, 1966 through March 24, 1967. Therefore, he continues, a finding of probable cause for the searches on May 5, 1967, *must* depend on the information supplied by the "confidential informant," which information alleged violations as recent as May 2, 1967. This information, appellant concludes, at least as it is set forth in the affidavit, fails to satisfy the test set forth in Spinelli v. United States, supra, and there was therefore no probable cause for the search warrants.

■ We reject appellant's contention that the telephone toll slips provide probable cause only up to March 24, 1967. We hold that the evidence contained in the telephone records of a continuous and uninterrupted pattern of unlawful wagering activity over a period of six months was sufficient to support an inference that the unlawful activity had *probably* continued substantially unchanged,[14] particularly when, as here, there was no evidence available to the investigating officers, following a reasonably thorough investigation, *negativing* the probability of such a continuation. Moreover, the affidavit for search warrant contained an adequate explanation of the *absence* of incriminating data for the intervening forty-two days.[15] A finding of probable cause for the search warrant for the premises could therefore have been properly grounded on the telephone toll slips alone. Probable cause for the "John Doe" warrant could properly have been grounded on the telephone toll slips, in combination with the observations of Agent Kish on April 28th, 1967, of a "white male with black, wavy hair and stocky build * * * sitting in Apt. 4–C and talking on the telephone." See p. 384 ante. This being the case, we find it unnecessary to determine whether or not that section of the affidavit dealing with the informant meets the test of *Aguilar* and *Spinelli*.

■ Appellant's final attack on the sufficiency of the affidavit concerns the *Marchetti* and *Grosso* cases, supra. He argues that since these cases eliminated

12. For example, in the Affidavit for Search Warrant, Agent Hopper states: Since March 14, 1967, up to the present date, I have assisted Special Agent Vernon B. Carpenter in coordinating an investigation of the wagering activities of (various persons) in connection with the Federal Wagering Tax Laws requiring the registration and purchase of a $50.00 occupational tax stamp * * * and the payment of a ten percent excise tax * * *" (Upon searching IRS records) I found no record of the registration or issuance of a (sic) occupations tax stamp-wagering to any of the individuals listed below or to anyone engaged in the business of receiving or accepting wagers at any of the addresses listed below: * * *

13. Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

14. We need not, in this case, fix the point in time at which such an inference would cease to be justified. Suffice it to say that that point is beyond the forty-two days, at least in the qualified circumstances of this case.

15. The affidavit contained the following explanation: The toll slips are generally retained by the telephone companies for a six months period after which they are destroyed. The toll slips pertaining to the current month are not available until approximately one week after the date of the bill to the customer. Therefore, the telephone toll slips available for analysis were limited to a six month period and the date of the last call as shown in the analysis of the toll slips is not necessarily the date of the last call made, but is the date of the last call for which toll slips are now available.

the underlying offense upon which the warrants were based, the probable cause for the warrants was likewise destroyed. This argument is based on the mistaken assumption that the Supreme Court invalidated the wagering tax statutes. The criminal offenses specified therein were not abolished. The cases merely held that a defendant may not *be convicted* under these statutes if he properly claims his constitutional privilege against self-incrimination. Washington v. United States, 402 F.2d 3 (4th Cir. 1969).

Even if *Marchetti* and *Grosso* had declared the wagering tax provision unconstitutional on its face, we would still hold that probable cause existed in this case since the search took place before those decisions.[16] " * * * (T)he search was entirely in conformity with law and in every respect 'reasonable' when it was made * * * " United States v. Boiardo, 408 F.2d 112, 114 (3rd Cir. 1969).

We now turn to appellant's contention concerning the "John Doe" search warrant. This warrant was directed to "John Doe, a white male with black wavy hair and stocky build observed using the telephone in Apartment 4–C, 1806 Patricia Lane, East McKeesport, Pennsylvania." We hold that the physical description of appellant, coupled with the precise location at which he could be found, was sufficient and the John Doe warrant was, therefore, valid. "Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area." United States v. Ventresca, 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965).

Appellant's argument that the agents exceeded the scope of the warrants in answering incoming telephone calls is likewise without merit. At trial, the only evidence introduced relating to these calls was appellant's response each time Agent Ziemba picked up the receiver.[17] There is nothing in the record to indicate the substance of any of the phone conversations, if in fact any took place. All we know is that Agent Ziemba answered the telephone several times. The narrow issue thus presented is whether government agents, who, in the process of executing a search warrant, have secured the premises and begun their search, may answer a telephone on the premises when it rings. We hold that they may. It may have a relevant message of utmost importance for the safety of those on the premises or other vital information. We express no opinion as to whether, in answering the telephone, an agent must identify himself. Nor need we rule on the admissibility of the substance of any conversation between the agent and the party on the other end. We merely hold that, as a reasonable concomitant of their control over the premises, the agents may answer a ringing telephone.

### The Right to Resist

Since the searches were lawful in every respect, there is merit neither in appellant's contention that he was prejudiced by the court's affirmative instruction that the agents were acting lawfully, nor in his arguments concerning a citizen's right to resist an unlawful "technical arrest." Considering the importance of the latter argument, however, we consider it appropriate in this case to discuss the merits thereof even assuming arguendo that the searches [18]

16. The search in this case was conducted on May 5, 1967. *Marchetti* and *Grosso* were decided January 29, 1968.

17. (See p. 384, supra at bottom) The government apparently introduced this evidence as proof of appellant's knowledge of the true identity of the agents.

18. Despite appellant's insistence that we are dealing with the right to resist an illegal arrest in this case, it is clear that we are really dealing with one's right to resist an illegal search. That there may be a "technical arrest" at the time of a search is important in some legal contexts (see, e. g., United States v. Festa, 192 F.Supp. 160 (D.Mass.1960)). This, however, is not such a case. The legality of the agents' conduct, including the legality of any "technical arrest" of appel-

in question were unlawful. For the reasons that follow, we hold that a person does not have a right to forcibly resist the execution of a search warrant by a peace officer or government agent, even though that warrant may subsequently be held to be invalid.[19]

 Society has an interest in securing for its members the right to be free from unreasonable searches and seizures. Society also has an interest, however, in the orderly settlement of disputes between citizens and their government; it has an especially strong interest in minimizing the use of violent self-help in the resolution of those disputes. We think a proper accommodation of those interests requires that a person claiming to be aggrieved by a search conducted by a peace officer pursuant to an allegedly invalid warrant test that claim in a court of law and not forcibly resist the execution of the warrant at the place of search. The development

of legal safeguards in the Fourth, Fifth, Sixth and Fourteenth Amendment fields in recent years has provided the victim of an unlawful search with realistic and orderly legal alternatives to physical resistance. Indeed, since the validity of written process is readily susceptible to judicial review, it is doubtful whether resistance to written process can ever be justified today, absent a showing of transparent invalidity.[20] This argument is particularly forceful when applied to the execution of search warrants, where resistance often leads to violence and physical injury. A public officer supported by written process has a right to expect that citizens will respond peaceably, that neither his life nor those of other parties will be endangered, and that any dispute will be resolved through legal means.[21]

For the reasons set forth above, the judgment of the District Court will be affirmed.

---

lant, turned on the legality of the search. Furthermore, realistically speaking, it was the *search* which appellant was forcibly resisting and not the restraint of his person.

19. We do *not* decide in this case:

(a) Whether a person would, under some circumstances, have a right to resist an unlawful *warrantless* search;

(b) Whether a person would, under some circumstances, have a right to resist an unlawful arrest made with or without a warrant;

(c) Whether there may be some unlawful arrests or searches, with or without warrant, the circumstances of which would be such a provocation to a reasonable man that the seriousness of the offense of resistance ought to be mitigated as a result of such provocation. See, generally, Chevigny, Paul G., The Right to Resist an Unlawful Arrest, 78 Yale L.J. 1128 (1969).

20. See, e. g., United States v. United Mine Workers, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947); Walker v. City of Birmingham, 388 U.S. 307, 87 S.Ct. 1824,

18 L.Ed.2d 1210 (1967); Chevigny, *supra*, note 19. We do not, however, mean to suggest that the "transparent invalidity" exception applies to the rule we lay down today in connection with the execution of search warrants. It does not. See, however, note 19(c).

21. Similar considerations to those outlined in this opinion have led several courts to conclude that there is no longer a right to resist an unlawful arrest. See United States v. Simon, 409 F.2d 474 (7th Cir. 1969); United States v. Heliczer, 373 F.2d 241 (2d Cir. 1967); State v. Koonce, 89 N.J.Super. 169, 214 A.2d 428 (1965), all of which questioned the continuing vitality of the two cases perennially cited in support of the right to resist: John Bad Elk v. United States, 177 U.S. 529, 20 S.Ct. 729, 44 L.Ed. 874 (1900) and United States v. DiRe, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948). The Uniform Arrest Act (Section 5) and the Model Penal Code (Section 3.04(2) (a) (i)) have also eliminated the right to resist an illegal arrest.