UNITED STATES of America,
Plaintiff-Appellee,

v.

Thomas F. DANEHY,
Defendant-Appellant.

No. 81–5216.

United States Court of Appeals,
Eleventh Circuit.

June 29, 1982.

Rehearing and Rehearing En Banc
Denied Nov. 3, 1982.

Robert W. Knight, Fed. Public Defender, Mark A. Pizzo, Asst. Fed. Public Defender, Tampa, Fla., for defendant-appellant.

Stephen M. Crawford, Tampa, Fla., for plaintiff-appellee.

Before VANCE, KRAVITCH and CLARK, Circuit Judges.

PER CURIAM:

Thomas Danehy appeals his conviction under 18 U.S.C. §§ 2, 111, and 1114 for

forcibly resisting, opposing, impeding, and interfering with Coast Guardsmen while they were engaged in the performance of their duties. We reverse his conviction and remand for a new trial below.

The facts of the case are much in dispute. Nevertheless, we shall try to describe generally what took place on the night of March 22, 1980. A distress call came into the Coast Guard Station at Cortez, Florida that night. Two Coast Guard personnel were dispatched in a seventeen-foot, open deck, tri-hulled craft to search for the distressed vessel. They were ordered to search the Intracoastal Waterway between Cortez and Sarasota Bay.

During this time the appellant, his wife, and his neighbors were cruising in the Intracoastal Waterway aboard Danehy's twenty-eight foot sport fisherman, the *Not for Fishing*. The two vessels met just north of Sarasota Bay. The Coast Guardsmen claim they hailed the appellant's vessel and inquired whether it was overdue. The people aboard Danehy's boat, however, claim no conversation ever took place and that they merely saw a small unlit vessel hovering in the shadows. Both sides are agreed, however, that contact was soon broken off with Danehy going north towards Bradenton and the Coast Guardsmen heading south towards Sarasota.

Later, the Coast Guard craft turned back to the north. The Coast Guardsmen claim that Danehy's boat attempted to ram them. They maneuvered their vessel out of the way, and the appellant began steering his boat in circles, causing the Coast Guard boat's motor to cavitate forcing it to stop dead in the water. The Coast Guardsmen claim that Danehy's vessel headed directly towards them, only turning away when they displayed their weapons.

Danehy has a different version of these events. He claims that an unknown craft running at full speed and without lights closed upon his vessel quickly. Danehy claims he became apprehensive and engaged in evasive maneuvers. He asserts that he tried to flee into a residential development.

Both sides are agreed that Danehy ran aground. The Coast Guardsmen radioed to Cortez for assistance and a Coast Guard cutter and two Manatee County deputies came to their aid. Two more Coast Guardsmen reinforced those already on the seventeen-foot craft. Here, again, the two accounts differ as to what transpired.

The Coast Guardsmen assert that the cutter turned on its blue light, that they identified themselves through a loud hailer, and that they informed Danehy that he should prepare to be boarded. The seventeen-foot craft then proceeded alongside Danehy's boat. Someone, according to this version, aboard Danehy's craft responded with obscenities that they would not be allowed to board. They then boarded the vessel. The Coast Guardsmen claim that while being frisked and handcuffed, Danehy rammed one of their number into the bulkhead twice and began kicking at the Coast Guardsmen. He had to be bodily carried off his vessel.

Danehy and his passengers give a different account of these events. They claim that the Coast Guard boarded without warning or requesting permission and with drawn weapons. Danehy was ordered on deck and after a considerable period arrested. He claims he was handcuffed and forced to kneel. He asserts that when he attempted to stand he was knocked down and that he never attempted to kick anyone. He claims that he passively resisted and remained limp, thereby forcing the Coast Guardsmen to carry him off the vessel.

Both sides agree that all the passengers were then taken off Danehy's boat. They boarded the Coast Guard cutter and arrived at Cortez early in the morning of March 23.

The appellant claims the trial court made three reversible errors. We turn to the first of these, the contention that the district court should have allowed Danehy to call three witnesses to testify to his reputation for truthfulness.

### I.

Danehy claims that under *United States v. Hewitt*, 634 F.2d 277 (5th Cir. 1981), he should have been allowed to introduce evidence of his reputation for truthfulness as his credibility had been attacked. We disagree.

■ We addressed precisely this issue in *United States v. Jackson*, 588 F.2d 1046, 1055 (5th Cir. 1979). There, as here, the "attack" on the defendant's credibility consisted of a vigorous cross-examination and the pointing out by the prosecutor of discrepancies between the defendant's testimony and that of other witnesses. This does not call into question the reputation of the defendant for truthfulness. The mere fact that a witness is contradicted by other evidence in a case does not constitute an attack upon his reputation for truth and veracity. *Kauz v. United States*, 188 F.2d 9 (5th Cir. 1951).

■ Danehy claims that under Rule 404 of the Federal Rules of Evidence an accused may always bring forth evidence of a pertinent character trait and that his reputation for truth is pertinent in the instant case. We reject this line of reasoning. Since Danehy is trying to offer evidence to bolster himself as a witness rather than to show a trait of character that is pertinent to the crime charged, it is Federal Rule of Evidence 608, not 404, that governs. Rule 608 specifically states that "evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise." Government counsel pointing out inconsistencies in testimony and arguing that the accused's testimony is not credible does not constitute an attack on the accused's reputation for truthfulness within the meaning of Rule 608. Thus, Danehy may not attempt to bolster his testimony by evidence as to his reputation for truthfulness. Therefore, the district court properly denied Danehy's request to call witnesses to testify to his reputation for truthfulness.

### II.

Danehy's second contention is that the trial court gave an improper jury instruction on whether it was necessary that Danehy know it was federal officers he was resisting. Tied in with this is Danehy's claim that he was improperly denied an instruction to the jury on the subject of resisting an unlawful arrest.

Danehy's theory of defense was that actions, if any, taken by him prior to the boarding of his vessel were justified because he did not know the identity of his pursuers and therefore he was acting in defense of his person and his property. After boarding, Danehy claims that his resistance, if any, was justified as resisting an illegal arrest. Because of this theory of defense, it was imperative for the defense to have the requested instructions. We turn first to the issue of whether Danehy was entitled to an instruction on his lack of knowledge as to the identity of the Coast Guard personnel.

Danehy requested the following jury instruction:

> Thus, to establish the offense of forcibly resisting, opposing, impeding, or interfering with a member of the Coast Guard in the performance of his official duties as charged in the indictment, there are four essential elements which must be proved beyond a reasonable doubt:

> First, that the defendant forcibly resisted, opposed, impeded, or interfered with any of the Coast Guard members described in the indictment;

> Second, that the Coast Guard members were Federal officials, as described above, then engaged in the performance of their official duties as charged; and

> Third, that the defendant did such acts willingly;

> Fourth, that the defendant did such acts knowingly.

The trial judge gave the above instruction with the exception of point four. He substituted the following for it:

It is not necessary to show that the defendant knew the people being forcibly resisted, opposed, impeded, or interfered with were, at that time, Federal officers carrying out an official duty; so long as it is established beyond a reasonable doubt that the victims were, in fact, Federal officers acting in the course of their duty and that the defendant willfully resisted, opposed, impeded, or interfered with them.

■ We hold that the trial judge was in error when he gave this instruction. This instruction is contrary to *United States v. Feola*, 420 U.S. 671, 679, 95 S.Ct. 1255, 1261, 43 L.Ed.2d 541 (1975); *United States v. Ochoa*, 526 F.2d 1278, 1281 (5th Cir. 1976); and *United States v. Young*, 464 F.2d 160, 163 (5th Cir. 1972). *Young* states that a defendant may not be held absolutely liable for assaulting a government officer when the defendant acts from a mistaken belief that he himself is threatened with an intentional tort by a private citizen. *Ochoa* goes further and states that even deadly force, in the proper circumstances, could be employed by the defendant if he could reasonably believe that the intruders were a threat to his person. The Supreme Court in *Feola* stated that "the situation is not one where legitimate conduct becomes unlawful solely because of the identity of the individual or agency affected." 420 U.S. at 685, 95 S.Ct. at 1264. Further, the Court explained that:

We are not to be understood as implying that the defendant's state of knowledge is never a relevant consideration under § 111. The statute does require a criminal intent, and there may well be circumstances in which ignorance of the official status of the person assaulted or resisted negates the very existence of *mens rea.* For example, where an official fails to identify himself or his purpose, his conduct in certain circumstances might reasonably be interpreted as the unlawful use of force directed either at the defendant or his property. In a situation of

that kind, one might be justified in exerting an element of resistance, and an honest mistake of fact would not be consistent with criminal intent.

420 U.S. at 686, 95 S.Ct. at 1264. This illustrates the all-important point that in a prosecution under 18 U.S.C. § 111 the defendant must either (1) know the person he is impeding is a federal officer *or* (2) engage in conduct towards that individual which would constitute a crime even if he were not a federal officer.

■ In the trial below, Danehy produced testimony which, if believed by the jury, would permit the conclusion that prior to the Coast Guard boarding, Danehy believed that he was defending himself against an intrusion by unknown persons. According to the decision in *United States v. Young*, 464 F.2d at 163, the trial court should have instructed the jury that it could not find Danehy guilty unless the jury believed that Danehy intended to forcibly resist, oppose, impede or interfere with the Coast Guard personnel, and that Danehy could not so intend if he acted out of a reasonable belief that the Coast Guard personnel were "strangers who intended to inflict harm upon [Danehy]." *Id.* Although the jury instructions requested by Danehy did not precisely conform to the instructions required by *Young*, the failure of the trial court to offer the correct instructions *sua sponte* was plain error. *Id.* at 164.

### III.

■ Danehy also contends that the trial court committed reversible error by refusing to deliver his jury instruction on justifiable resistance to an arrest not based upon probable cause. We conclude that under the circumstances of this case, Danehy had no right to forcibly resist the Coast Guard arrest, even on the unlikely supposition that the arrest was unlawful. The trial court therefore committed no error in refusing to deliver Danehy's proposed instruction.

Speaking for the court in *United States v. Johnson*, 542 F.2d 230, 233 (5th Cir. 1976), Judge Morgan evaluated the current vitali-

ty of the common law right to forcibly resist unlawful arrest. He concluded that old Fifth Circuit case law on the subject had been "sapped of its precedential value" by the persuasive authority of decisions from the other courts of appeals. Those decisions recognize that the common law right to resist an arrest that is not based upon probable cause, suited though it may have been to a past era, has no significant role to play in our own society where ready access to the courts is available to redress such police misconduct. *See, e.g., United States v. Cunningham*, 509 F.2d 961, 963 (D.C. Cir. 1975); *United States v. Martinez*, 465 F.2d 79, 82 (2d Cir. 1972); *United States v. Simon*, 409 F.2d 474, 477 (7th Cir.), *cert. denied*, 396 U.S. 829, 90 S.Ct. 79, 24 L.Ed.2d 79 (1969). *Cf. United States v. Ferrone*, 438 F.2d 381, 389–90 (3d Cir.), *cert. denied*, 402 U.S. 1008, 91 S.Ct. 2188, 29 L.Ed.2d 430 (1971) (no right to resist search pursuant to invalid search warrant). *But see United States v. Moore*, 483 F.2d 1361, 1364 (9th Cir. 1973) (dictum). Although there may be some residual role for the common law right where it appears that the arresting officer is engaged in a "frolic of his own," *see United States v. Martinez*, 465 F.2d at 82, there was no such situation here.

We conclude that the trial court's error in instructing the jury on the element of intent under section 111 requires a new trial.

REVERSED AND REMANDED FOR NEW TRIAL.

CLARK, Circuit Judge, concurring in part and dissenting in part:

I concur in Parts I and II of the majority opinion and dissent with respect to Part III,

the section holding that a citizen cannot resist an unlawful arrest.

This decision is against a tradition existing for hundreds of years in both English and American common law.[1] In this judge's opinion it is contrary to holdings of the United States Supreme Court. Nevertheless, there is respectable federal and state law supporting the majority opinion.[2] My reasons for dissenting are twofold. First, the majority opinion is not in accord with Supreme Court precedent. Second, the rule announced is too broad.

The majority reasoning is that a citizen, if unlawfully arrested, should go along to the police station, make bond [the majority assume he can] and later sue the policeman for the tort of unlawful arrest. The citizen is not justified in using even passive force to resist.

An analysis of the problem has some difficulties. It requires consideration of these factors:

(1) The extent of the unlawfulness of the arrest. The technical invalidity of an otherwise valid arrest warrant at one extreme and a totally unjustifiable warrantless arrest with force at the other.

(2) The extent of the force used by the arrestee in resisting. Killing at one end of the spectrum and passively "going limp" at the other.

(3) The extent of the force used by the arresting officer and the circumstances surrounding the arrest. For example, is the arrestee in his home, is the offense a felony or a misdemeanor, is the arrestee

---

1. *Hopkin Huggert's Case*, 84 Eng.Rep. 1082 (K.B. 1666); *John Bad Elk v. United States*, 177 U.S. 529, 20 S.Ct. 729, 44 L.Ed. 874 (1900).

2. A cursory review of the law of the various states with respect to right to resist an unlawful arrest indicates that 16 states have abolished the common law right to resist either by statute or judicial action, and at least 10 states recognize the continued vitality of the common law right. The Model Penal Code § 3.04(2)(a)(i) reads as follows:

    (2) *Limitations on Justifying Necessity for Use of Force.*

    (a) The use of force is not justifiable under this Section:
    (i) to resist an arrest which the actor knows is being made by a peace officer, although the arrest is unlawful . . .

I find no clear federal rule other than that set out in the Supreme Court cases cited in the text. A helpful annotation on the subject is in 44 A.L.R.3d 1078. This annotation notes several law review articles on the subject.

apt to flee if force is not used to make the arrest, is the officer covering his tracks for a wrongful arrest by charging the arrestee with resisting?

(4) One's philosophy about the relationship between the government and the citizen, particularly the effect of the fourth amendment prohibiting arrest absent a warrant or probable cause.

My conclusion is that a citizen should have the right to resist unlawful arrest and, if charged with the offense of resisting, receive an instruction on the right to resist arrest. This is especially true under circumstances where there is no arrest warrant, the citizen does not have any reason to believe he has committed a criminal offense in the presence of the officer, and the resistance does no bodily harm to the officer. Under Danehy's version of the evidence, he was entitled to the requested instruction in this case. If Danehy's account was accepted by the jury, it is for the jury to weigh his rights *vis-a-vis* the officer.

The Supreme Court in *United States v. Di Re*, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948), had the following to say about the right to resist arrest:

> The Government also makes, and several times repeats, an argument to the effect that the officers could infer probable cause from the fact that Di Re did not protest his arrest, did not at once assert his innocence, and silently accepted the command to go along to the police station. *One has an undoubted right to resist an unlawful arrest, and courts will uphold the right of resistance in proper cases.*

*Id.*, 332 U.S. at 594, 68 S.Ct. at 228 (emphasis added). One could argue that the statement in *Di Re* is dicta. However, this also is the holding in *John Bad Elk*, 177 U.S. at 536, 20 S.Ct. at 732, decided by the Supreme Court in 1900.

*John Bad Elk* was a case where the arrestee killed the arresting officer and was convicted of murder by the jury and sentenced

to be hanged. The trial judge refused to give an instruction on the right to resist arrest. The Supreme Court reversed and held that an instruction should have been given to the jury and that

> the offense of the party resisting arrest would be reduced from what would have been murder if the officer had had the right to arrest, to manslaughter. What would be murder if the officer had the right to arrest might be reduced to manslaughter by the very fact that he had no such right. So an officer, at common law, was not authorized to make an arrest without a warrant, for a mere misdemeanor not committed in his presence ... *If the officer had no right to arrest, the other party might resist the illegal attempt to arrest him, using no more force than was absolutely necessary to repel the assault constituting the attempt to arrest.*

*John Bad Elk v. United States*, 177 U.S. 529, 534, 20 S.Ct. 729, 731, 44 L.Ed. 874 (1900) (emphasis supplied).

In my opinion, none of the cases cited by the majority support the conclusion reached that a citizen can never resist an unlawful arrest. The majority enacts a new federal statute. I disagree with the majority's conclusion that *United States v. Johnson*, 542 F.2d 230, 233 (5th Cir. 1976), controls this case. In *Johnson*, the defendant was one of three persons in an automobile being chased by FBI officers who suspected the three of being implicated in a bank robbery. The flashing red light and siren of the agents' car was on as the chase began. A minor collision occurred, and the defendant jumped out of the pursued car with gun in hand and pointed it at one of the agents who fired his weapon. The court stated:

> Thus we hold that the mere invalidity of a law officer's conduct under the fourth amendment, without more, can never justify the threat of deadly force in opposing the officer.

*Ibid.* at 233 (footnote omitted). The facts of *Johnson* differ sufficiently from the

present case being considered by this panel to warrant a different result.

*United States v. Cunningham,* 509 F.2d 961 (D.C. Cir. 1975), is not persuasive. In that case, the defendants were resisting being placed in a police lineup after a court order directed that they participate in the lineup. Thus, the facts are too different to influence a decision in the instant case. *United States v. Martinez,* 465 F.2d 79 (2d Cir. 1972), is inapposite because the officers had probable cause. The court remarked: "Even were the arrest without probable cause, Martinez was not justified in responding with the excessive force he displayed." 465 F.2d at 82. As I understand the facts of the case before us, Danehy claims that he was only passively resisting arrest and that he used no force. Thus, I think the instruction should have been given.

*United States v. Simon,* 409 F.2d 474 (7th Cir.), *cert. denied,* 396 U.S. 829, 90 S.Ct. 79, 24 L.Ed.2d 79 (1969), is a case involving a narcotics arrest where the court held there was probable cause and the officers had information leading them to believe that Simon was about to leave the country. They went to his home, identified themselves, and told Simon they were there to arrest him. Simon told the agents he was not going anywhere and kicked one agent before they could put handcuffs on him. *United States v. Ferrone,* 438 F.2d 381 (3d Cir. 1971), involved an invalid search warrant being executed by Internal Revenue Service agents, and the defendant kicked and elbowed the agents.

I do not think any of these circuit court opinions are relevant because none involve a requested instruction to the court. In-

stead, they involved the sufficiency of the evidence to support a conviction for resisting arrest. That question is not before us. If Danehy's instruction had been given and he had been convicted, I would elect to affirm because the officers testified that Danehy rammed one of them into the bulkhead and began kicking at another. However, that is not his theory. Under our system,[3] if the law permits an acquittal upon any theory of the defendant which is supported by some evidence, then the defendant is entitled to a jury instruction on that subject. That is the holding in *John Bad Elk, supra.* None of the cases cited by the majority involve either the factual or legal position stated by Danehy, and I think the trial court should have given the instruction.

**3.** As the Court of Appeals for the District of Columbia Circuit has said:

> We do not intend to characterize the case for the defense as either strong or weak. That is unnecessary, for "in criminal cases the defendant is entitled to have presented instructions relating to a theory of defense for which there is any foundation in the evidence, even though the evidence may be

weak, insufficient, inconsistent, or of doubtful credibility. He is entitled to have such instructions even though the sole testimony in support of the defense is his own." (citations omitted).

*Tatum v. United States,* 1950, 88 U.S.App.D.C. 386, 190 F.2d 612, 617, quoted with approval in *Strauss v. United States,* 5 Cir. 1967, 376 F.2d 416, 419.