OPINION
{¶ 1} Appellant Keith Alan Styblo seeks reversal of his conviction on three counts of rape, a violation of Section 2907.02(A)(1)(b), (B) of the Ohio Revised Code, felonies of the first degree, and two counts of gross sexual imposition, a violation of Section 2907.05(A)(4) of the Ohio Revised Code, felonies of the third degree. Appellant argues that the jury's verdict was against the manifest weight of the evidence, and that the trial court erred in refusing to permit character witnesses from testifying as to Appellant's reputation for honesty, and refusing to admit the victims' medical records into evidence.
 {¶ 2} Because the jury verdict was supported by credible evidence, the trial judge correctly concluded that Appellant could not bolster his own testimony by evidence of truthful character. Further, the jury had knowledge that the victims were in therapy prior to leveling their accusations against Appellant. The record supports conviction in this matter and the judgment of the trial court is affirmed.
 Facts {¶ 3} Appellant is the natural father of J.S. and L.S., the victims in this case, who were ages 6 and 7, respectively, at the time of the crimes. Appellant and the children's mother, Kathy McWhorter ("McWhorter"), divorced in April 1998, and Appellant exercised minimal visitation until November, 2002. The crimes took place between 2002 and late 2003, when Appellant exercised visitation with the children at his home in Belmont County.
 {¶ 4} Appellant was convicted based upon graphic testimony provided by the children, who testified that most of the criminal acts took place during "secret time," *Page 2 
that is, time when Appellant would take each of the children into his bedroom to be alone with him. (Trial Tr., pp. 335, 386.) J.S. testified that Appellant removed his clothes during "secret time," told her to remove her clothes, touched her inappropriately, and engaged in anal, oral, and vaginal sex with her. (Trial Tr., pp. 336-345). L.S. testified that, during "secret time," Appellant told her to remove all of her clothes except her underwear and fondle herself, while he read a book. (Trial Tr., pp. 392-393.)
 {¶ 5} Both children testified that Appellant told them not to tell anyone about "secret time." (Trial Tr., pp. 345, 397.) Both children testified that Appellant's second wife, Lucinda Styblo ("Lucinda"), was at work during "secret time." (Trial Tr., pp. 351-352, 387.)
 {¶ 6} Appellant and Lucinda claim that the phrase "secret time" was coined by J.S., (Trial Tr., pp. 526, 550), to describe the three times in July and August of 2003 that Appellant took each of the children into his bedroom to talk with him privately.
 {¶ 7} According to Appellant, he instituted "secret time" after J.S. confided in Lucinda that her step-sister, S.W., was being molested by her father, Robert Wilson ("Wilson"), and that Wilson "was trying to get [J.S.] to do the same to him." (Trial Tr., pp. 506-507, 557.) Appellant testified that J.S. made her allegations about Wilson "when [Lucinda] and the girls were in the girl's bedroom" and "[t]hey would talk about girl stuff." (Trial Tr., p. 551.) *Page 3 
 {¶ 8} "Secret time" was characterized by Appellant as a way to put the children at ease and to allow them to speak outside of Lucinda's presence about Wilson. (Trial Tr., p. 558.) Appellant testified that he got "serious information" from J.S. during the third session and that he and Lucinda became "very, very concerned." (Trial Tr., p. 551.)
 {¶ 9} Appellant further testified that he was never really alone with the children. Appellant claimed that he required Lucinda to stand outside of the bedroom door during "secret time" in order to "verify" J.S.'s story about Wilson. (Trial Tr., p. 557.) In addition, Appellant testified that Lucinda eavesdropped on "secret time" because of concerns that he had about accusations that might be leveled against him by McWhorter. (Trial Tr., pp. 576-577.) Appellant also testified that Lucinda's grandson was always asleep in the bedroom during "secret time." (Trial Tr., pp. 570-571.)
 {¶ 10} Lucinda's testimony and the testimony of her daughter, Melissa Smith ("Melissa") corroborated some, but not all, of Appellant's testimony. They both testified that Lucinda was not at work when Appellant exercised his visitation rights, (Trial Tr., pp. 471-472, 497), and according to Lucinda, she eavesdropped during "secret time." (Trial Tr., p. 516.)
 {¶ 11} However, on cross-examination, Lucinda denied that her purpose in eavesdropping was to insulate Appellant from scurrilous allegations that McWhorter might level against him. (Trial Tr., p. 516.) We note that she never testified that she was eavesdropping in order to confirm J.S.'s allegations about Wilson. Instead, she *Page 4 
testified that she eavesdropped on "secret time" because she wanted to know "what the kids were telling their dad." (Trial Tr., p. 516.) When asked what the children talked about during "secret time," Lucinda responded:
 {¶ 12} "Well, [L.S.] talked about school and friends in school and that and their teachers. [J.S.] talked about silly stuff. And most of the time I just wanted to find out what should we do, you know, where to take them and that. And sometimes listen to what they had to say for something to do with where we'd take them the next day or, you know. If she wanted a pair of shoes or something like that, and we'd go get her a pair of shoes. It just had something to do with what they talked about. Like, daddy, I wish I had this and that." (Trial Tr., pp. 524-525.)
 {¶ 13} In addition to the crimes committed during "secret time," L.S. testified that Appellant touched her inappropriately when he bathed them. (Trial Tr., pp. 394-397.) However, Appellant, Lucinda, and Melissa testified that J.S. objected to being bathed by Appellant during their first visit, and, as a consequence, Appellant never bathed them. (Trial Tr., pp. 482-483, 500, 549-550.)
 Assignment of Error No. 1 {¶ 14} "The judgment was against the manifest weight of the evidence."
 {¶ 15} Appellant contends that two of the prosecution witnesses, McWhorter and Mary Horton ("Horton"), the children's babysitter, as well as members of the Belmont County Children Services, manipulated the children into giving false testimony against him. Appellant further argues that Lucinda and Melissa's *Page 5 
testimony, that he was never alone with the girls at their home, was all but ignored by the jury.
 {¶ 16} The manifest weight of the evidence test goes to whether the evidence is persuasive or believable. State v. Thompkins (1997),78 Ohio St.3d 380, 387, 678 N.E. 2d 541. "Weight is not a question of mathematics, but depends on [the evidence's] effect on inducingbelief." (Emphasis in original.) Id. citing Black's Law Dictionary (6th Ed. 1990) 1594.
 {¶ 17} "[W]hen reviewing whether a verdict is against the manifest weight of the evidence, an appellate court must review the entire record, consider the credibility of the witnesses, and determine whether `the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" State v. Duque, 2005-Ohio-4187, ¶ 19, citingThompkins, supra.
 {¶ 18} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." Id. at 387,678 N.E.2d 541, citing Tibbs v. Florida (1982), 457 U.S. 31, 42,102 S.Ct. 2211, 72 L.Ed.2d 652.
 {¶ 19} A thorough review of the trial transcript reveals several inconsistencies in the defense testimony.
 {¶ 20} The testimony provided by Appellant and Lucinda regarding "secret time" was wholly inconsistent. According to Lucinda, J.S. invented "secret time" because, "* * * she wanted to tell a secret, and then she kept saying secret time, *Page 6 
because she wanted talk [sic] one-on-one with you and she didn't want [L.S.] there." (Trial Tr., p. 526.) According to Appellant, although J.S. coined the phrase "secret time," the sessions were Lucinda's idea. He testified:
 {¶ 21} "I didn't like the idea of trying to pull them one-on-one, because I thought maybe one would think they were being favored above the other. But when I asked them about it, they thought, they said that [it] was fine, because they both wanted time with me.
 {¶ 22} "But when my wife brought it to the — she said that [J.S.] had said something to her that caught her attention, but wouldn't talk to her any more at that time. She asked me to talk to them privately and say, look, you know, what's going on, to try to get them to open up." (Trial Tr., p. 551.)
 {¶ 23} Appellant characterized his conversations with the children during "secret time" as an investigation into J.S.'s allegations about Wilson. Appellant contended that he excluded Lucinda from the conversations so that the children could speak freely about Wilson. However, both Appellant and Lucinda testified that the children frequently confided secrets in Lucinda. As a matter of fact, it was Lucinda to whom J.S. first divulged Wilson's alleged molestation of S.W. Consequently, Appellant's stated concern that the children would be reluctant to discuss Wilson in front of Lucinda appears contrived.
 {¶ 24} Further, Appellant also testified that he told Lucinda to eavesdrop on the conversations in order to shield him from unfounded allegations about "secret time" from McWhorter. To the contrary, Lucinda testified that her decision to *Page 7 
eavesdrop on the children had nothing to do with any concerns about accusations by McWhorter. She testified that she listened to their conversations solely to determine what the children needed or wanted to do the next day.
 {¶ 25} Finally, Lucinda provided no testimony to support Appellant's contention that "secret time" was undertaken at Lucinda's suggestion only for the purpose of investigating J.S.'s allegations about Wilson. When asked to summarize the children's conversations with Appellant, Lucinda did not mention any discussion regarding Wilson. The fact that Lucinda's summary of "secret time" did not include any mention of Wilson is particularly compelling since Appellant testified that his third secret session elicited "serious information" from J.S. which caused Lucinda to be "very, very concerned." (Trial Tr., p. 551.)
 {¶ 26} Based upon the foregoing analysis, the jury's decision to accept the testimony of the children and reject the testimony of Lucinda and Melissa is supported by the record. The jury could have reasonably rejected Lucinda's testimony because of the numerous inconsistencies between her testimony and the testimony of Appellant. Appellant cannot point to any internal inconsistencies in the children's accounts, and the graphic and detailed accounts of the molestation provided by the children do not comport with Appellant's contention that their stories have been fabricated. Accordingly, Appellant's first assignment of error is overruled. *Page 8 
 Assignment of Error No. 2 {¶ 27} "The Court erred when disallowing the testimony of character witnesses on behalf of the Defendant."
 {¶ 28} "A trial court has broad discretion to determine the admissibility of lay witness opinion testimony." State v. Keith, 3rd Dist. No. 1-06-46, 1-06-53, 2007-Ohio-4632, ¶ 43, citing State v.Auerbach (1923), 108 Ohio St. 96, 98. "The term `abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable."State v. Adams (1980), 62 Ohio St.2d 151, 157, 404 N.E.2d 144.
 {¶ 29} The state objected to the proposed testimony of three character witnesses: Sherry Telesz, Wendy Stewart, and Michelle Blum. In response to an inquiry by the court, Appellant's counsel stated that each of the witnesses would testify about Appellant's, "reputation * * * for truthfulness in the community." (Trial Tr., p. 594.)
 {¶ 30} Contrary to Appellant's second assignment of error, the trial judge did not prevent the proposed witnesses from taking the stand. (Trial Tr., p. 593.) The trial judge merely stated that Evid. R. 608 prevented the proposed witnesses from bolstering Appellant's credibility in regard to his truthfulness because his character had not been attacked, "by opinion or reputation evidence or otherwise."
 {¶ 31} Evid. R. 608(A) reads, in its entirety:
 {¶ 32} "The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence *Page 9 
may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise."
 {¶ 33} The trial court held that, "[t]he condition precedent for the use of a rehabilitation character witness is an attack on the character of the primary witness, and mere impeachment of the primary witness is insufficient to authorize the calling of a positive character witness." (Trial Tr., pp. 597.)
 {¶ 34} The Tenth District Court of Appeals addressed a similar challenge in an appeal from a rape conviction in State v. Ponce (October 10, 1996), 10th Dist. No. 95 APA 11-1450. In Ponce, the state was permitted, over the defendant's objection, to elicit testimony from the victim's teacher that she had a reputation for honesty. The defendant argued that the testimony was improper because the witness' character for truthfulness had not been attacked by opinion or reputation evidence or otherwise. The state responded that the defense attacked the witness' credibility in its opening statement and on cross-examination, and it was, therefore, entitled to put on evidence of her character for truthfulness.
 {¶ 35} The Ponce Court rejected the state's argument because the defense did not attempt to show that the witness was a dishonest person by the admission of opinion or reputation evidence of her dishonesty or untruthfulness. The Court reasoned:
 {¶ 36} "Vigorous cross-examination or opening statements do not constitute the type of attack upon a witness' character for truthfulness envisioned by *Page 10 
Evid. R. 608(A)(2). See United States v. Thomas (C.A.5, 1985), 768 F.2d 611, 618;United States v. Danehy (C.A.11, 1982), 680 F.2d 1311, 1314; but seeBeard v. Mitchell (C.A.7, 1979), 604 F.2d 485. Accepting the state's argument would essentially read Evid. R. 608(A)(2) out of existence by permitting the veracity of any witness whose version of the facts are in dispute to be bolstered by evidence of truthful character." Id. at 7.
 {¶ 37} The same is true in the case at bar. Appellant's character was not attacked by opinion or reputation evidence, or, for that matter, impeached on cross-examination. Therefore, Evid. R. 608(A) does not permit the admission of evidence of truthful character. As a consequence, Appellant's second assignment of error is overruled.
 Assignment of Error No. 3 {¶ 38} "The Court erred when disallowing records of the Defendant's daughters into evidence."
 {¶ 39} Appellant argues that J.S. and L.S.'s state medical records, which were provided to him pursuant to a court order, should have been admitted as self-authenticating public records under Evid. R. 1005. Appellant claims that, "[t]he admittance of these records was imperative in that it established that the children and their mother had emotional issues prior to the girls making the sexual abuse allegations against [Appellant.]" (Appellant's Brief, p. 5.)
 {¶ 40} The trial judge refused to admit the documents pursuant to Evid. R. 902(2), which states that domestic public documents not under seal are self-authenticating *Page 11 
only if an officer or employee certifies under seal that the signer has the official capacity and that the signature is genuine.
 {¶ 41} The trial judge added that even if the medical records were properly authenticated, they would be inadmissible under Evid. R. 803(8)(B) because the sources of information included in the medical records indicated a lack of trustworthiness. (Trial Tr., p. 452.) The trial judge stated that the records were, "replete with hearsay upon hearsay and with opinion that is stated without foundation." (Trial Tr., p. 452.) More specifically, the judge based his decision on the fact that the only witness who was presented with the medical records, Horton, was not familiar with them. She testified that the records were inaccurate based upon her recollection of the events. (Trial Tr., p. 452.)
 {¶ 42} Also, Appellant's concern that the jury did not know that the children were in counseling before the sexual allegations were leveled against him are misplaced. The parties entered into the following stipulation:
 {¶ 43} "Before the sexual allegations were made by [L.S. and J.S.] in and around November of 2003, both girls were already in counseling at Northwood Health Systems in Wheeling, West Virginia for behavioral management problems. [L.S.] began her counseling on May 13 of 2003. And [J.S.] began her counseling on August 14 of 2003." (Trial Tr., pp. 299-300.)
 {¶ 44} Testimony was presented that McWhorter had emotional problems prior to November 2003. Appellant and Melissa testified that the children arrived for their first visit at Appellant's home in dirty clothes and infested with lice. (Trial Tr., pp. 477, *Page 12 
575.) Appellant testified that he reported McWhorter to the West Virginia Department of Human Resources. (Trial Tr., p. 572.) On cross-examination, McWhorter conceded that she had encounters with the Protective Services Agency in West Virginia in 2002 and 2003. (Trial Tr., p. 211.) When asked why Protective Services came to her house, she said she did not know. (Trial Tr., p. 212.)
 {¶ 45} Based upon the stipulation and the trial testimony, the trial court correctly concluded that the victims' medical testimony was not properly authenticated and lacked a proper foundation. As a consequence, Appellant's third assignment of error is also overruled and his conviction is affirmed in full.
Vukovich, J., concurs.
 DeGenaro, P.J., concurs. *Page 1