**UNITED STATES of America, Appellee,**

v.

**Jeffrey GOLDSON, Appellant.**

**No. 561, Docket 91–1442.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 17, 1991.

Decided Jan. 10, 1992.

Andrew J. Frisch, New York City (Gustave H. Newman, Richard A. Greenberg, and Newman & Schwartz on the brief), for appellant.

Geoffrey S. Mearns, Asst. U.S. Atty., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., and Stanley J. Okula, Jr., Asst. U.S. Atty., on the brief), for appellee.

Before TIMBERS, MESKILL and KEARSE, Circuit Judges.

TIMBERS, Circuit Judge:

Appellant Dr. Jeffrey Goldson appeals from a judgment entered July 12, 1991, after a jury trial, in the Eastern District of

New York, Arthur D. Spatt, *District Judge,* upon a verdict of guilty of assaulting a federal officer, in violation of 18 U.S.C. § 111 (1988). Goldson was convicted of throwing a brick at a government agent's car while the agent was engaged in an undercover operation.

On July 12, 1991, Judge Spatt sentenced Goldson to three years probation and ordered him to pay an $8,500 fine (in part to cover the cost of probation), a special assessment of $50, and restitution in the amount of $400 to be paid to the Drug Enforcement Agency (DEA).

Goldson asserts several claims of reversible error, including among others the district court's refusal to instruct the jury that Goldson's reasonable mistaken belief that the agent was a private citizen intending to harm him would constitute a valid defense to the crime charged.

I.

We shall summarize only those facts and prior proceedings believed necessary to an understanding of the issues raised on appeal.

Dr. Goldson is a physician and surgeon. Currently, he operates a neighborhood walk-in clinic at 230–11 Linden Boulevard, Cambria Heights, Queens, New York.

Goldson resides with his wife and two small children at 168 Evergreen Drive, Westbury, a residential community on Long Island. Prior to the incident giving rise to this appeal, Goldson became concerned for the safety of himself and his family because of criminal activity which had occurred in his home neighborhood and near his place of employment. Goldson testified that "[t]wo of [his] closest friends who worked in the same area [in which he works] had been murdered in the last month." Furthermore, Goldson was aware of a number of robberies that had occurred in his neighborhood. He testified that two of his neighbors had been burglarized several times. His own house had been burglarized prior to his purchasing it. He had complained to the police about suspicious activity in his neighborhood. He also testified that a friend who was one of his patients and who lived very close to him "had been caught in route home and [assailants] grabbed him by his neck and poured lye down his throat and [he] had 21 surgeries since then."

Furthermore, Goldson, who specialized in emergency medicine, was very familiar with the crime problems in the metropolitan New York area. Since he was a surgeon who worked late hours, he was particularly concerned about his family's safety at night. For these reasons, he had a security alarm system installed at his house. The alarm activated flood lights whenever someone approached Goldson's house or pulled into his driveway. The alarm specialist who installed the system testified that Goldson told him that he needed the alarm because "he was afraid of being robbed when he pulled into the driveway."

On May 7, 1990, at about 6:00 pm, unknown to Goldson, six DEA agents began surveillance of a house located at 174 Salem Road, Westbury, New York. The agents suspected that the house, which is located around the corner from Goldson's house at 168 Evergreen Drive, contained $500,000 in cocaine. Surveillance was conducted from unmarked cars. The agents took turns driving past the target house.

Unaware of this surveillance, Goldson returned home with his family at about 8:00 pm on May 7, 1990. As he pulled into his driveway, he saw a "shadowy figure" cross his lawn and enter a car parked in front of a vacant house across the street from his residence. He found that his burglar alarm had been activated. After bringing his children inside his house and making sure that the house was secure, Goldson left the house to get a sandwich from a delicatessen. En route to the delicatessen, he noticed that the suspicious car, which he later learned was special agent Michael McGurk's vehicle, was still parked across the street from his house in front of a vacant lot. Goldson testified that as he got into his car he noticed McGurk's car pull away. He further testified that as he was driving to the delicatessen he noticed that

McGurk's car was directly in front of his car. He attempted to record McGurk's license plate number, but he could not find a pencil. McGurk, on the other hand, asserts that Goldson, before getting into his car, stared at him for five minutes, after which McGurk drove away from Evergreen Drive to avoid compromising the surveillance operation. McGurk says that Goldson then intentionally followed him, but, after making an evasive maneuver, he was able to lose Goldson in traffic.

Goldson testified that upon returning home he observed from a bay window in his living room that McGurk was "driving up and down the street erratically." At one point, Goldson noticed McGurk drive down his street and then make a U-turn and head back toward his house.

McGurk testified that at about 9:30 pm that night he drove down Evergreen Road to observe the target house on Salem Road. As he passed Goldson's house at about ten miles per hour, he heard a "loud bang from the rear of [his] vehicle", after which he immediately stopped. He then turned around and saw Goldson approaching his vehicle on foot from about twenty five feet away, holding his hand on his rear waistband, apparently pretending to have a weapon. When McGurk identified himself as a police officer, Goldson responded, "I thought you were a thief." McGurk then noticed a brick in the road approximately ten feet behind his car. By that time several other DEA agents had arrived at the scene. The first to arrive was special agent Bradley Cheek. Cheek testified that he was driving about two hundred feet behind McGurk and there were no cars between his and McGurk's; but he did not see the brick thrown. Indeed, there was no testimony that any object was seen being thrown at McGurk's vehicle. Cheek further testified that he heard Goldson yelling at McGurk, "[W]hy are you terrorizing me? What are you doing? You are terrorizing my family and my neighborhood." Throughout the confrontation Goldson denied throwing anything at McGurk's vehicle.

Several agents testified that, despite the fact that McGurk's vehicle had been in two prior accidents, they nevertheless noticed a dent in the back side panel of the vehicle that was not there prior to May 7, 1990. Furthermore, the brick that was found in the road had paint on it that matched the paint on McGurk's car. Several of the agents testified that they saw a pile of loose bricks near Goldson's house that were similar to the one found in the roadway. Goldson, on the other hand, asserted that this type of brick was used throughout the neighborhood to hold down newspapers.

Goldson, an Afro–American, testified that the agents spewed racial epithets and accused him of "mess[ing] it up" and "bl[owing] the whole thing." The agents said that they did not use abusive language. The agents accompanied Goldson back to his house where more heated words were exchanged for a brief period. The agents subsequently left without making an arrest.

On May 10, 1990, however, DEA agents arrested Goldson at his clinic in Cambria Heights. They charged him with assaulting a federal officer. Goldson asserts that while handcuffed he fell to the ground and sustained a hand injury. Since the charges of assaulting a federal officer were not presented to a grand jury in a timely manner, they were dismissed by the court without prejudice on June 8, 1990. Goldson commenced a civil action to recover charges for hand injuries sustained during his arrest.

Goldson subsequently was indicted upon a charge that resulted in the conviction that is the subject of this appeal. After pleading not guilty, a two day trial ensued. Goldson continued to assert during his trial that he did not throw any object at McGurk's vehicle.

He made it clear, however, that he wished to have the jury instructed that, even if they found that he threw the brick at McGurk's car, they should acquit him if they found that he reasonably believed at the time of the confrontation that "agent McGurk was a civilian who intended him

harm." The district court denied Goldson's request on the ground that there was no factual basis for Goldson's self-defense theory. The court stated:

"[T]he defendant says here I didn't throw the brick. There is no illegal act on my part, not that I did throw the brick, but I did it because I thought the man was a thief or a burglar and I wanted to chases [sic] him away from my wife and family.

\* \* \* \* \* \*

[O]f course there is no foundation here for a defense of self defense or I threw it mistakenly, that's not so here. There is not a shred of evidence as to that. He did or didn't do it. He says and so swore that he didn't do it. The issue is clear and sharp."

Furthermore, the court stated in its jury charge:

"The crime of assaulting a federal officer is designed to protect federal officers and federal functions. Therefore, it is sufficient for the government to show that the defendant intended to perform the acts that are charged upon a man who in fact was a federal agent engaged in the performance of his official duty. But whether the defendant knew that the victim was a federal officer at the time of the alleged assault *is irrelevant to such a determination and should not be considered by you.*" (emphasis added).

Although the trial lasted only two days, the jury deliberated for approximately four days. During their deliberations, the jury sent questions to the court on three occasions requesting, among other things, instructions on the elements necessary for a conviction on the charge of assaulting a federal officer and an explanation of the law regarding reasonable doubt and circumstantial evidence.

## II.

We turn first to Goldson's primary contention that the district court erred in refusing to submit to the jury his defense that he did not reasonably know that McGurk was a federal agent engaged in an undercover operation at the time of the alleged assault, and that a reasonable belief that McGurk was a private citizen who intended to harm him was a viable defense.

Goldson was convicted under 18 U.S.C. § 111 which provides: "Whoever forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of official duties ... shall be fined under this title or imprisoned not more than three years, or both." DEA agents are designated as protected individuals under 18 U.S.C. § 1114.

Generally, knowledge of the identity of a federal officer is unnecessary for a conviction under § 111. In *United States v. Feola*, 420 U.S. 671, 684 (1975), the Court held:

"[I]n order to effectuate the congressional purpose of according maximum protection to federal officers by making prosecution for assaults upon them cognizable in the federal courts, § 111 cannot be construed as embodying an unexpressed requirement that an assailant be aware that his victim is a federal officer. All the statute requires is an intent to assault, not an intent to assault a federal officer. A contrary conclusion would give insufficient protection to the agent enforcing an unpopular law, and none to the agent acting under cover."

*See also United States v. Young*, 464 F.2d 160, 163 (5 Cir.1972).

In *Feola*, however, the Court qualified its holding by stating:

"We are not to be understood as implying that the defendant's state of knowledge is never a relevant consideration under § 111. The statute does require a criminal intent, and there may well be circumstances in which ignorance of the official status of the person assaulted or resisted negates the very existence of *mens rea. For example, where an officer fails to identify himself or his purpose, his conduct in certain circumstances might reasonably be interpreted as the unlawful use of force directed either at the defendant or his property. In a situation of that kind, one might be justified in exerting an element of*

*resistance,* and an honest mistake of fact would not be consistent with criminal intent."

420 U.S. at 686 (emphasis added). Accordingly, Goldson correctly contends that § 111 should not be construed to hold individuals absolutely liable for assaulting federal officers when the assault was based on a mistaken belief that the assailant was threatened with an intentional tort from a private citizen. *Young, supra,* 464 F.2d at 163 ("[I]f the defendant asserts a lack of intention or wilfulness based upon ignorance of the identity of the victim and ignorance of the victim's official privilege to interfere with the defendant's person or freedom of movement, the jury must be allowed to consider the defendant's evidence tending to show that he was ignorant of the official capacity of the victim."); *see also United States v. Danehy,* 680 F.2d 1311 (11 Cir.1982); *United States v. Ochoa,* 526 F.2d 1278, 1281 (5 Cir.1976); *United States v. Perkins,* 488 F.2d 652, 654–55 (1 Cir.1973), *cert. denied,* 417 U.S. 913 (1974).

"[A] defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States,* 485 U.S. 58, 63 (1988); *see also United States v. LaMorte,* 950 F.2d 80, 84 (2 Cir.1991) ("It is well settled that 'a criminal defendant is entitled to have instructions presented relating to any theory of defense for which there is any foundation in evidence, no matter how weak or incredible that evidence may be.'") (quoting *United States v. Durham,* 825 F.2d 716, 718–19 (2 Cir.1987)); *United States v. Pedroza,* 750 F.2d 187, 205 (2 Cir.1984) (same).

The fact that Goldson's requested jury instruction was inconsistent with his testimony was not a correct reason for the court to have refused to give the instruction. In *Mathews,* the Court held that "even if the defendant denies one or more elements of the crime, he is entitled to an entrapment instruction whenever there is sufficient evidence from which a reasonable jury could find entrapment." *Mathews, supra,* 485 U.S. at 62. There appears to be no reason to limit *Mathews* to the

entrapment context. Indeed, the Fifth Circuit has held that "[I]t is well established that a criminal defendant may raise inconsistent defenses, and is entitled to an instruction on any defense or lesser included offense whenever there is evidence sufficient for a reasonable jury to find in her favor, even when the defense and lesser included offense are inconsistent with each other." *United States v. Browner,* 889 F.2d 549, 555 (5 Cir.1989). Specifically, the court held in *Browner* that a defendant was entitled to a jury instruction that she did not intend to stab her husband, and, in the alternative, that she stabbed him in self-defense. *Id.; see Arcoren v. United States,* 929 F.2d 1235, 1245 (8 Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 312 (1991) (holding that a defendant was entitled to a jury instruction that he reasonably believed the victim was at least sixteen years old, and, in the alternative, that he had no sexual contact with her).

The Court acknowledged in *Mathews* that permitting inconsistent defenses may increase the chances of perjury. The Court, however, held that permitting inconsistent defenses does not "necessarily sanction[ ] perjury". *Mathews, supra,* 485 U.S. at 65. An appropriate way for the courts to respond to perjury is an upward departure in sentencing, rather than denying defendants the ability to present alternative defenses. *United States v. Bonds,* 933 F.2d 152, 155 (2 Cir.1991); U.S.S.G. § 3C1.1. Perjury is also a federal crime.

The district court here recognized that Goldson was entitled to an instruction on a "theory of the defense for which there is any foundation in the evidence, even though the evidence may be weak, insufficient or of doubtful creditability", and that he "is entitled to ... such instruction even though the sole testimony in support of [his] defense is his own." The court, however, denied Goldson's requested jury instruction because it found that "[t]here [was] not a shred of evidence" that Goldson threw the brick in the mistaken belief that McGurk was a private citizen who threatened him. The court apparently discounted the evidence supporting Goldson's alternative defense because of Goldson's testimony that he did not throw the brick. The

court erred, however, because defendants should be permitted to present wholly inconsistent defenses.

We hold that there was sufficient evidence to support the proposed jury instruction. The facts as summarized above show that there was adequate evidence for the jury to have concluded that Goldson reasonably believed that he was defending himself and his family against criminal activity during his encounter with McGurk.

We hold that the district court erred in failing to give the requested jury instruction.

### III.

To summarize:

The fact that Goldson urged alternative theories was not a correct reason for the court to have refused to give his requested jury instruction. There was ample evidence to support either of Goldson's defenses. Accordingly, Goldson should have been allowed to contend that he did not throw the brick, but, even if he did throw it, he did so only because he thought that McGurk was a private citizen who intended to harm him.

*Reversed and remanded for a new trial.*