**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Santiago Guadalupe OCHOA,**
**Defendant-Appellant.**

**No. 75–2808.**

United States Court of Appeals,
Fifth Circuit.

Feb. 12, 1976.

Charles D. Butts, Fred A. Semaan, San Antonio, Tex., for defendant-appellant.

John Clark, U. S. Atty., James E. Bock, Ronald P. Guyer, Asst. U. S. Attys., San Antonio, Tex., for plaintiff-appellee.

Before COLEMAN and INGRAHAM, Circuit Judges, and O'KELLEY, District Judge.

INGRAHAM, Circuit Judge.

Santiago Guadalupe (Jimmie) Ochoa was indicted in six counts for assaulting agents of the federal Drug Enforcement Agency (DEA), violations of 18 U.S.C. § 111.[1] Ochoa waived his right to trial by jury, and the trial court found him guilty of five counts. Punishment was

---

1. 18 U.S.C. § 111 states:

"Whoever forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of his official duties, shall be fined not more than $5,000 or imprisoned not more than three years, or both.

"Whoever, in the commission of any such acts uses a deadly or dangerous weapon, shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

assessed at confinement for twenty-five years in the federal penitentiary.

Ochoa appeals the conviction and claims he acted reasonably but under a mistake of fact, believing that the agents were intruders attempting to damage his home or injure his family. Because the government failed to establish the necessary *mens rea*, Ochoa argues, the conviction should be reversed.

Following the arrest of Allen Gorsch, DEA agents received information relating to a violation of federal narcotics laws. Based on the information from Gorsch, federal agents procured four arrest warrants and a search warrant from a United States Magistrate. The agents devised a plan of operation designed to result in the simultaneous arrest of the four suspects before execution of the search warrant.

Four teams departed from the DEA headquarters and proceeded to execute the respective arrest warrants. One team composed of agents Alonzo, Henderson, Cavalier, Lewis, Overstreet, Seay and Losoya arrived at Ochoa's home at about 10:30 P.M.[2] The team then split; three agents went to the backyard; four remained in front.

DEA Agent James Henderson, accompanied by Agents Overstreet and Cavalier, knocked at the back door of Ochoa's house and shouted, "Police officers. We have got a warrant." The agents saw the inside lights diminish and heard movement from within; nevertheless, there was no verbal response from Ochoa. After the shouts of authority were ignored three times, Agent Henderson forced the back door open with his shoulder. Ochoa fired his 30-caliber semi-automatic rifle in Henderson's direction—fortunately, without wounding the agents. Agents returned fire.

Agent James Seay, accompanied by Lewis, Losoya and Alonzo, approached the front door and identified himself to be a federal officer with an arrest warrant. His shouts were also ignored. When Lewis heard the shooting in the backyard, he forced open the front door. Ochoa fired his rifle at Lewis wounding him three times.

Ochoa held the federal agents at bay in the face of repeated commands to surrender, coupled with statements of authority. Agent Alonzo even illuminated his badge with a flashlight and threw his identification inside the Ochoa house. Nevertheless, Ochoa refused to submit to arrest until *after* arrival of city ambulance and a fully uniformed San Antonio police officer.

Ochoa does not contest the facts of the occurrence; rather he contends that he lacks the *mens rea* necessary for a conviction under 18 U.S.C. § 111.

Ochoa and his wife testified that they were awakened by a phone call at 10:30 P.M.—the caller stated, "Jimmie, que paso?" and hung up. Subsequently, Ochoa saw several men surrounding his house. When the men began to beat on the front and back doors of his house,

2. Evidence establishes that the arrests were made as early as possible: Gorsch provided the information after 2 o'clock P.M.; The information was, then, verified between 4 o'clock and 6 o'clock P.M. The United States Magistrate issued the arrest and search warrants at 9 o'clock P.M., and agents arrived at Ochoa's home at 10:30 P.M. Based on this timetable, Agent Montoya concluded that it was not possible to begin the raid before night.

In regard to the adequacy of illumination, Officer Cavalier testified:

"Q Describe the lights for me that was in that back yard.

A There was a large bulb in a wall socket of the house adjacant, the next house over west of the location where we were at. There was enough light there to cast shadows.

Q Was there any light on inside the house?

A No, sir.

Q Were you able to see inside the house and see someone inside the house?

A Yes, sir.

Q Even though there was no light on inside the house?

A We had basically sufficient light in the back yard. I was carrying a flashlight. I didn't bother to use it."

Ochoa grabbed a rifle. He fired when the men forced the doors open.

Ochoa and his wife stated that they were unaware of the true identity of the men and were afraid that the men had unlawful intentions.[3] The assault, he claims, was a reasonable act in defense of his family and property.

The Supreme Court recently stated:

"[W]e think it plain that Congress intended to protect *both* federal officers and federal functions, and that, indeed, furtherance of the one policy advances the other.

\*　　\*　　\*　　\*　　\*　　\*

"[I]n order to effectuate the congressional purpose of according maximum protection to federal officers by making prosecution for assaults upon them cognizable in the federal courts, § 111 cannot be construed as embodying an unexpressed requirement that an assailant be aware that his victim is a federal officer. *All the statute requires is an intent to assault, not an intent to assault a federal officer.* A contrary conclusion would give insufficient protection to the agent enforcing an unpopular law, and none to the agent acting under cover.

"This interpretation poses no risk of unfairness to defendants. It is no snare for the unsuspecting. Although the perpetrator of a narcotics 'rip-off,' such as the one involved here, may be surprised to find that his intended victim is a federal officer in civilian apparel, he nonetheless knows from the very outset that his planned course of conduct is wrongful. The situation is not one where legitimate conduct becomes unlawful solely because of the identity of the individual or agency affected. In a case of this kind the offender takes his victim as he finds him. *The concept of criminal intent does not extend so far as to require that the actor understand not only the nature of his act but also its consequence for the choice of a judicial forum.*

"We are not to be understood as implying that the defendant's state of knowledge is never a relevant consideration under § 111. *The statute does require a criminal intent, and there may well be circumstances in which ignorance of the official status of the person assaulted or resisted negates the very existence of mens rea. For example, where an officer fails to identify himself or his purpose, his conduct in certain circumstances might reasonably be interpreted as the unlawful use of force directed either at the defendant or his property.* In a situation of that kind, one might be justified in exerting an element of resistance, and an honest mistake of fact would not be consistent with criminal intent.

"We hold, therefore, that in order to incur criminal liability under § 111 an actor must entertain merely the criminal intent to do the acts therein specified. We now consider whether the rule should be different where persons conspire to commit those acts."

*United States v. Feola*, 420 U.S. 671, 679–86, 95 S.Ct. 1255, 1261, 43 L.Ed.2d 541 (1975) (emphasis added, footnotes omitted); *accord, United States v. Perkins*, 488 F.2d 652, 654–55 (1st Cir. 1973); *United States v. Langone*, 445 F.2d 636, 637 (1st Cir. 1971); *United States v. Goodwin*, 440 F.2d 1152, 1155–57 (3rd Cir. 1971); *United States v. Young*, 464 F.2d 160, 163 (5th Cir. 1972).

This is a classic case in which the question of defendant's knowledge is relevant under 18 U.S.C. § 111. If Ochoa was unaware of the agents' identity *and* reasonably believed that they intended to damage his home or injure his family, he would be entitled to an acquittal. On the other hand, if Ochoa could be charged with knowledge of the agents'

---

**3.** Testimony establishes that there was publicity concerning robberies in the San Antonio area involving assailants representing themselves to be law enforcement officers.

identity, a conviction would be proper. Additionally, if for other reasons the defense of justification is unavailable—e. g., if the defendant resorted to excessive force under the circumstances—a conviction would be proper without knowledge of the agents' identity. *See United States v. Perkins*, 488 F.2d 652, 654–55 (1st Cir. 1973).

In this case, there is no issue of excessive force. Because the intruding federal agents were armed with deadly weapons, Ochoa would be entitled to counter an unauthorized attack with equal force. It is critical to determine whether appellant could reasonably believe that the intruders imposed a threat to his person, property or family, *and* whether he had reason to know the intruders were federal agents.

▮▮▮▮ The following facts adduced in the government's evidence negate Ochoa's claim of reasonable conduct: (1) agents announced their identity at the front and back doors of Ochoa's house;[4] (2) the announcements at each door were loud enough to be heard by agents situated at the opposite door; (3) several agents wore official blue DEA raid jackets with insignia embossed thereon;[5] (4) Ochoa continued his siege *after* the arrival of a city ambulance. Under these circumstances, we conclude that the trial court's conclusion that Ochoa either knew or should have known the agents' identity was supported by sufficient evidence. The standard for review, irrespective of whether the evidence is direct or circumstantial, is whether reasonable minds could conclude that the evidence is inconsistent with the hypothesis of the accused's innocence. *United States v. Ragano*, 520 F.2d 1191, 1203, n. 16 (5th Cir. 1975).[6] We affirm the judgment of the district court.

---

**4.** Announcements were made in the English and Spanish languages. Agent Henderson stated, "I am testifying that there is no doubt in my mind that the people inside the residence heard me when I knocked on the back door and they also heard the people at the front."

The repeated announcements were sufficient to charge the accused with knowledge of the police officers' identity. *See Carter v. United States*, 231 F.2d 232, 235 (5th Cir. 1956), and cases cited therein. In *Carter* Chief Judge Brown stated:

"It is not for the defendant either on the trial for the obstruction, or in the event giving rise to it, to lay down the requirements as to the nature or kind or amount of proof of the Officer's status. His badge, his written credentials, his Commission are not the only means. His declaration of his official status may well be enough, . . . especially where, as here, it is repeatedly made, and its acceptance as the truth by defendants is credited through the jury's verdict of guilty."

231 F.2d 232, 235 (5th Cir. 1956) (citations omitted).

**5.** Agents were dressed primarily in civilian clothing. Some of the agents, however, wore navy blue raid jackets with gold embossments. One shoulder embossment depicted the emblem of the San Antonio Police Department; the other shoulder embossment depicted the emblem of the Department of Justice, DEA division. A replica of a DEA badge—four times larger than an official badge—appeared on the front of the jacket.

**6.** Ochoa did not request the trial court to find the facts specifically, as he might have done under Rule 23(c) of the F.R.Crim.P., thus special findings were waived. On appeal, findings will be implied in support of the judgment if the evidence, viewed in a light most favorable to the government, warrants them. *McClain v. United States*, 417 F.2d 489, 492 (9th Cir. 1969); 8 Moore's Federal Practice ¶ 23.05 (2d ed. 1965).