[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

Nos. 07-14176 and 07-14196

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 29, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 04-60216-CR-JIC

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

KENNETH WILK,
a.k.a. Kenneth P. Wilk,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(June 29, 2009)

Before DUBINA, Chief Judge, BIRCH and WILSON, Circuit Judges.

WILSON, Circuit Judge:

Kenneth Wilk appeals his convictions for unlawfully killing a state law

enforcement officer assisting in a federal investigation, attempted second-degree murder of a state law enforcement officer assisting in a federal investigation, knowingly carrying and using a firearm during and in relation to a crime of violence, possession of child pornography, obstruction of justice, and conspiracy. After thoroughly reviewing the record and considering the parties' briefs, and with the benefit of oral argument, we affirm.

## I. BACKGROUND

In the summer of 2001, Wilk's domestic partner, Kelly Ray Jones, was arrested and convicted on child pornography charges.[1] During Jones's prosecution, Wilk made threats against law enforcement personnel, some of which he made online under his computer screen name "Wolfpackeines." Wilk's online profile listed hobbies such as "hunting cops," occupations such as "cop bashing," and "alerting people about kiddy porn stings." Around this time, Wilk purchased several firearms and participated in firearm skill shooting contests throughout Florida. Wilk purchased additional firearms in 2002 and 2003.

On July 12, 2004, while on supervised release, Jones sent images depicting child pornography to an undercover law enforcement agent. The images were transmitted from Wilk's internet account on a computer at the residence shared by

---

[1] Jones was sentenced to 28 months of imprisonment and 3 years of supervised release. A condition of Jones's supervised release was that he not use the Internet.

Jones and Wilk. After further investigation, law enforcement obtained and executed a search warrant on the residence. Officers recovered numerous child pornography images and arrested Jones on the scene.

While Jones was incarcerated, he instructed Wilk to contact a witness whom the police had told Jones not to contact. Wilk went to the witness's apartment to dissuade him from cooperating with law enforcement. At Jones's direction, Wilk sent derogatory e-mails to the witness's business associate in an attempt to discredit the witness. Further communication between Jones and Wilk suggested that Wilk planned to threaten or kill a witness against Jones. Also at Jones's instruction, Wilk deleted e-mails relevant to Jones's child pornography charges.

Federal agents obtained an arrest warrant for Wilk and a search warrant for his residence. Early in the morning of August 19, 2004, Deputy Sheriff Todd Fatta and Sergeant Angelo Cedeno of the Broward County Sheriff's Office ("BCSO") assisted federal agents, including Immigration and Customs Enforcement Agent Christopher Harvey, in executing the warrants. The agents initially planned to use a ruse to lure Wilk from the residence but abandoned the idea after learning that Wilk anticipated such a tactic. Cedeno determined the officers' assignments and the order of entry. After surrounding Wilk's residence and announcing themselves, the officers forcibly entered.

3

Fatta entered the residence first, followed by Cedeno. Upon entry, two large caliber gunshots were heard, followed by several smaller caliber gunshots. The other officers opened fire, allowing an injured Cedeno to escape. Wilk appeared at the open front door and surrendered, and the officers found a gun in the doorway where Wilk exited. Inside the residence, officers found Fatta on the floor, motionless and not breathing. Despite revival attempts, he died from a shot to the chest.[2] Other than Wilk, no one was found in the residence. Tests on Fatta's gun revealed that he fired no shot.

A second superseding indictment charged Wilk with seven Counts: (1) killing Fatta, a state law enforcement officer, while Fatta assisted in a federal investigation, in violation of 18 U.S.C. §§ 1121(a)(1)(A) and 1111; (2) killing Fatta, a state law enforcement officer, while Fatta assisted a federal agent engaged in the performance of his official duties, in violation of 18 U.S.C. §§ 1111(a) and 1114; (3) attempting to kill Cedeno, a state law enforcement officer, while Cedeno assisted a federal agent engaged in the performance of official duties, in violation of 18 U.S.C. §§ 1113 and 1114; (4) knowingly carrying and using a firearm during and in relation to a crime of violence, i.e., the killing and attempted killing of

_____

[2] All of the officers, including Fatta, were wearing bullet-proof vests. Because of the type of gun used to shoot Fatta (a Winchester 30-30 rifle), the bullets would have penetrated vests rated even higher than the ones the officers wore.

individuals assisting a federal officer, in violation of 18 U.S.C. §§ 924(c)(1) and 924(j)(1); (5) obstruction of justice in connection with the federal prosecution of Jones, in violation of 18 U.S.C. § 1503(a); (6) possession of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and 2; and (7) conspiring to tamper with a witness and destroy evidence, in violation of 18 U.S.C. § 1512(k).

At trial, Wilk testified for six days in his defense. He testified that on the morning of August 19, 2004, he was in his home drinking a cup of coffee and heard no police announcement. Wilk explained that on that morning, he was suffering from an ear infection that impaired his hearing, which was corroborated by expert testimony. According to Wilk, he heard a crashing noise and grabbed his gun, fearing that he was being attacked because he had previously been a victim of anti-gay vandalism and hate mail. Wilk testified that a dark figure, pointing a gun in Wilk's direction, stood in the living room and confronted him and that no police markings were visible. Wilk asserted that he fired his gun in fear for his life and that he acted in self-defense. One of Wilk's experts testified that Wilk suffered from AIDS dementia at the time and that Wilk's ability to assess a stressful situation was impaired. Wilk also presented expert testimony that at the time of the shooting, he suffered from diminished capacity, neurological disorders, brain damage, and was insane.

The jury returned guilty verdicts on all counts except Count 3, on which the jury found Wilk guilty of the lesser-included offense of the attempted second-degree murder of Cedeno.

## II. DISCUSSION

Wilk challenges on appeal numerous rulings by the district court. Among other things, Wilk argues that the district court improperly excluded evidence of the slain law enforcement officer's steroid use and evidence pertaining to proper police procedures; erred by failing to suppress evidence of Wilk's confidential medical records; and erred by modifying the self-defense jury instruction. We address each of these issues in turn.

### A. Evidence of Steroid Use and Proper Police Procedures

Wilk contends that the district court improperly excluded evidence of Fatta's steroid use and evidence that the officers did not follow proper police procedures when they entered Wilk's home. We review evidentiary rulings for abuse of discretion. *United States v. Perez-Oliveros*, 479 F.3d 779, 783 (11th Cir.), *cert. denied*, 127 S. Ct. 2964 (2007). An abuse of discretion occurs if the district court applies an incorrect legal standard or makes findings of fact that are clearly erroneous. *United States v. Izquierdo*, 448 F.3d 1269, 1276 (11th Cir. 2006).

Fatta's post-mortem examination revealed that he had steroids in his blood,

6

and Wilk sought to admit this evidence as relevant to his self-defense claim. In excluding the evidence, the district court found that with respect to Wilk's defense, Fatta's steroid use was clearly irrelevant, would not tend to prove or disprove any material fact at issue, and that the prejudicial effect and confusion of the issues substantially outweighed any probative value of the evidence. Wilk maintains that this evidence was relevant to his defense because a person on steroids can act aggressively and erratically, which would have corroborated his testimony that the officers acted like armed home invaders instead of police officers. Wilk asserts that the exclusion of the steroid evidence denied him the opportunity to (1) rebut government's theory of motive; (2) demonstrate the state of mind and level of intent; (3) corroborate his claim of self-defense; (4) present his version of events to the jury; and (5) establish his claim of self-defense.

Federal Rule of Evidence 401 defines relevant evidence as that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Yet relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." FED. R. EVID. 403.

Wilk fails to show how the district court abused its discretion in excluding

7

the steroid evidence. We agree with the district court that Fatta's and the other officers' actions at the time of entry were relevant to Wilk's defense, but that the underlying reasons for Fatta's mode of entry tended to neither prove nor disprove any material fact at issue. Further, we find incredible Wilk's claim that he was unable to present his version of events to the jury, as he testified in his defense for *six* days. Indeed, even Wilk's record testimony that he was confronted by a dark figure standing in his living room, pointing a gun in Wilk's direction, fails to corroborate his assertion that Fatta acted aggressively or erratically. The strongest evidence supporting any aggressive or erratic behavior is that Fatta kicked out the front window of the residence. Yet the record reflects that Fatta did so only as the other officers were attempting, without success, to break through the front door. Most importantly, no evidence exists that Fatta was the aggressor in the shoot-out—to the contrary, the record shows that no shot was ever fired from Fatta's gun.

In short, even if the steroid evidence had some relevance, we are hard-pressed to see how it was crucial or necessary to Wilk's establishment of a valid defense. *See United States v. Todd*, 108 F.3d 1329, 1332 (11th Cir. 1997) (a court's discretion to rule on the relevance of evidence "does not . . . extend to the exclusion of crucial relevant evidence necessary to establish a valid defense"). Quite simply, Wilk fails to show any abuse of discretion by the district court.

Likewise, we find no reversible error in the district court's exclusion of expert testimony about whether the officers followed proper police procedure during entry into Wilk's residence. At trial, Wilk attempted to introduce the expert testimony of William Gaut, whose report and testimony allegedly would have revealed that the entry team was improperly dressed in civilian clothing, had inadequate police markings, appeared to be armed invaders, and violated established procedure in raiding the residence. According to Wilk, this evidence went directly to his self-defense, justification, and imperfect self-defense claims.

The district court determined that testimony about the BCSO's protocols, standards, or policies in executing search warrants was irrelevant and would not assist the jury in understanding the evidence or determining a fact in issue under Federal Rule of Evidence 702. We agree.

We first note that Wilk cites no authority about the admissibility of evidence relating to police procedures. In any event, the evidence relevant to Wilk's self-defense claim was his perception of the officers' actions that morning, not whether the officers followed proper procedure in executing the search warrant. *Cf. United States v. Henderson*, 409 F.3d 1293, 1304 (11th Cir. 2005) ("The issue in this case was not whether it was proper police procedure for an officer to place his service weapon out of reach before engaging a suspect in a physical confrontation, but

9

whether or not [the officer] actually did so.").  Further, no allegation exists that the government attempted to introduce evidence that the officers strictly complied with established procedures.  Thus, we cannot conclude that the district court abused its discretion in excluding the evidence when Wilk's six-day testimony provided him ample opportunity to present his perception of that morning's events.  No reversible error exists.

### B.  Wilk's Confidential Medical Records

Next, Wilk submits that the district court erred in denying his motion to suppress evidence and testimony relating to his medical and psychological records from: (1) the University of Miami; (2) Dr. Fisher, one of Wilk's treating HIV physicians; (3) the Cleveland Clinic of Florida; (4) the Federal Detention Center; and (5) Massachusetts Mutual.  Wilk asserts that these records were protected by the patient-psychotherapist privilege, the Health Insurance Portability and Accountability Act ("HIPAA"), and the Florida Statutes.  The district court found the psychiatrist-patient privilege inapplicable to certain records, declined to recognize a physician-patient privilege, and found that Wilk's other arguments were equally inapplicable.[3]  The arguments that Wilk presents on appeal are

---

[3] The district court adopted the Report and Recommendation of the United States Magistrate Judge assigned to the case, overruling Wilk's objections to the Report and Recommendation.

essentially identical to those raised in the district court.

As an initial matter, the magistrate judge who recommended that Wilk's motion be denied properly deemed the motion a motion in limine to exclude the records as privileged under Federal Rule of Evidence 501. Because Wilk did not address this issue in a Fourth Amendment context but rather treated the issue as an evidentiary matter, our standard of review is abuse of discretion. *Perez-Oliveros*, 479 F.3d at 783.

All of the records at issue were submitted to the magistrate judge for *in camera* review, and the magistrate judge heard argument on the motion. The parties stipulated that all of the records, except those from the University of Miami, were obtained by grand jury subpoenas after Wilk's arrest. The University records were obtained pursuant to an Order Enforcing Grand Jury Subpoena issued by the magistrate judge.

Wilk has shown no abuse of discretion as to the admission of the records at issue. Notably, the court granted Wilk's motion to exclude two records authored by psychologists from the Federal Detention Center, finding the two records subject to the psychotherapist-patient privilege. However, none of the University of Miami records, which Wilk claims should have been subject to the privilege, indicated that Wilk ever consulted with any personnel about his emotional well-

11

being. Trial testimony also revealed that Wilk received no psychiatric treatment at the University. Further, Wilk signed an "Informed Consent Form," which provided that the University would be required to release his information "as specifically required by law." A records request pursuant to a court order or grand jury subpoena undoubtedly qualifies as a "required by law" situation. We find no error in the district court's finding that some of Wilk's records were entitled to the psychotherapist-patient privilege and others were not.

As for the medical records concerning Wilk's HIV status and treatment, the record reveals that during his trial, Wilk continually relied on his mental status from AIDS dementia as central to his defense. For example, Wilk told the jury in his opening statement about suffering from AIDS dementia at the time of the shooting, and later called expert witnesses to testify on his behalf who referenced the medical records at issue. Indeed, the records from the Cleveland Clinic and Dr. Fisher were admitted as Defendant's Exhibits 45 and 46. Further, the district court correctly concluded that HIPAA authorizes the disclosure of confidential medical records for law enforcement purposes, or in the course of a judicial proceeding, in response to a court order or grand jury subpoena. *See* 45 C.F.R. §§ 164.512(e)(1)(i), (f)(1)(ii)(A-C). Wilk also concedes that federal courts have declined to recognize a physician-patient privilege in federal criminal trials. We

12

therefore find no abuse of discretion in the district court's decision declining to adopt Florida's physician-patient privilege as to Wilk's HIV-related medical records.

### C. Modification of the Self-Defense Jury Instruction

Lastly, we address Wilk's contention that the district court's modification of the self-defense jury instruction constituted reversible error. "We review the legal correctness of a jury instruction *de novo*, but defer on questions of phrasing absent an abuse of discretion." *United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000) (citations omitted). "Generally, district courts have broad discretion in formulating jury instructions provided that the charge as a whole accurately reflects the law and the facts, and we will not reverse a conviction on the basis of a jury charge unless the issues of law were presented inaccurately, or the charge improperly guided the jury in such a substantial way as to violate due process." *Id.* (quotations and citations omitted).

The district court issued the following as part of the self-defense instruction:

> In order to refuse or negate a claim of self-defense, the Government must prove beyond a reasonable doubt either: (1) [t]hat the Defendant knew *or had reason to know* Todd M. Fatta and Angelo Cedeno were law enforcement officers engaged in the performance of their duties; *or* (2) [t]hat the Defendant's use of deadly force would not have qualified as self-defense even if Todd M. Fatta and Angelo Cedeno had, in fact, been private

13

citizens.

(emphasis added). Relying on *United States v. Alvarez*, 755 F.2d 830, 842 (11th Cir.), *cert. denied*, 474 U.S. 905 (1985), Wilk contends that the district court erred in using the phrase "or had reason to know" because it improperly broadened the government's ability to negate Wilk's self-defense claim. We disagree. Contrary to Wilk's contention, the district court's instruction was not inconsistent with the principles outlined in *Alvarez*, which clarified the "knowledge of official status" requirement previously espoused in *United States v. Danehy*, 680 F.2d 1311, 1315 (11th Cir. 1982), *United States v. Ochoa*, 526 F.2d 1278, 1281-82 (5th Cir. 1976), and *United States v. Young*, 464 F.2d 160, 163 (5th Cir. 1972).[4]

In *Alvarez*, the defendants were convicted of, among other things, first degree murder and assault of a federal agent with a deadly and dangerous weapon under 18 U.S.C. §§ 111, 1111(a), and 1114. *Alvarez*, 755 F.2d at 836. The defendants alleged that they acted in self-defense in shooting two federal agents because the defendants believed that the agents were members of the Mafia. *Id.* at 841. The defendants appealed the district court's refusal to instruct the jury that the government was required to prove that the defendants knew at the time of the

---

[4] In all three of these pre-*Alvarez* cases, the defendant was convicted of assault of a federal agent with a dangerous and deadly weapon under 18 U.S.C. § 111. *Alvarez* applied the same rationale with respect to the "knowledge of official status" requirement in cases under 18 U.S.C. §§ 111, 1111(a), and 1114.

shootings that the victims were federal agents. *Id.* at 842. In clarifying our previous holdings in *Danehy* and *Young*, we first repeated well-established precedent that under 18 U.S.C. § 111, "[k]nowledge of the victim's status as a federal officer is not an element of the federal crime . . . ." *Id.* We also cited the longstanding principle that "when a defendant presents evidence in support of a claim of self-defense, the absence of self-defense must be proven beyond a reasonable doubt by the government." *Id.* at 842-43 (citations and footnote omitted).

Recognizing that some circumstances may exist where ignorance of the official status of the person assaulted negates the existence of *mens rea*, we held that when a defendant raises a self-defense claim based on ignorance of official status, the government has *several* options available to negate a self defense claim. Proof that the defendant knew of the victim's federal status is merely one option. *Id.* at 843. We held that "the defendant must *either* (1) know the person he is impeding is a federal officer *or* (2) engage in conduct towards that individual which would constitute a crime even if he were not a federal officer." *Id.* at 843 (internal quotation marks and citation omitted).

These options available to the government are not inconsistent with precedent established in *Ochoa*, also an 18 U.S.C. § 111 prosecution. 526 F.2d at

15

1278. In that case, Ochoa argued that he acted in defense of his family and property in assaulting federal agents, lacking the *mens rea* necessary for a conviction because he believed that the "intruders" into his home were home invaders, not federal officers. *Id.* at 1281. In affirming Ochoa's conviction, the court stated that Ochoa would have been entitled to an acquittal if he was unaware of the agents' identity and reasonably believed that they intended to injure him. *Id.* But in concluding that sufficient evidence supported the trial court's conclusion that Ochoa either knew or should have known the agents' identities, the court stated that "[i]t is critical to determine whether appellant could reasonably believe that the intruders imposed a threat to his person, property, or family, *and* whether he *had reason to know* the intruders were federal agents." *Id.* at 1282 (emphasis added).

Wilk refers to the court's language as dicta and attempts to distinguish *Ochoa* on the basis that Ochoa's convictions resulted from a bench trial. We reject these arguments. First, we are not convinced that the court's "knew or should have known" language was merely dicta when the court called it "critical to determine." *Id.* at 1282. Further, as for the knowledge requirement, the former Fifth Circuit made no distinction between bench and jury trials. We find nothing in *Alvarez* inconsistent with *Ochoa*, and *Ochoa* remains good law.

16

Most importantly, Wilk also ignores the fundamental principle restated in *Alvarez* that the correctness of a jury charge must be considered in the context of the instructions as a whole. *Alvarez*, 755 F.2d at 845. Viewed in its entirety, the charge given in Wilk's case permitted the jury to find Wilk not guilty if it believed his testimony that he acted in self-defense. *See Young*, 464 F.2d at 163 ("[I]f the defendant asserts a lack of intention . . . based on ignorance of the identity of the victim . . ., the jury must be allowed to consider the defendant's evidence tending to show that he was ignorant of the official capacity of the victim."). Under *Alvarez*, a defendant who raises a self-defense claim based on lack of knowledge of the victim's federal status is entitled to an instruction about the relevance of the defendant's state of knowledge, and the jury charge "should include (1) an explanation of the essential elements of a claim of self-defense, and (2) and instruction informing the jury that the defendant cannot be convicted *unless* the government proves, beyond a reasonable doubt, *either* (a) that the defendant knew that the victim was a federal agent, *or* (b) that the defendant's use of deadly force would not have qualified as self-defense even if the agent had, in fact, been a private citizen." *Alvarez*, 755 F.2d at 847 (emphasis added). Here, the district court properly followed that directive, accurately instructing the jury on the elements of self-defense and properly including the two-part instruction.

17

Considering the instruction as a whole, the instruction did not deprive Wilk of his right "to have presented instructions relating to a theory of defense for which there is any foundation in the evidence." *Id.* at 847 (internal quotation marks and citation omitted). On this record, we cannot find an abuse of discretion because the instruction accurately reflects the law and the facts, and the jury was not guided in such a way as to violate Wilk's due process rights.

Moreover, even if Wilk had met his burden of production on his self-defense claim, the evidence was sufficient to allow a rational jury to find the non-existence of self-defense beyond a reasonable doubt notwithstanding the "had reason to know" phrase. In *Alvarez*, we acknowledged that upon an extraordinary set of facts, the government *may* be required to prove that the defendant knew of the victim's federal status; for example, if the undisputed evidence shows that the agent was the aggressor and that the defendant's responsive force was reasonable. *Alvarez*, 755 F.3d at 844. Here, that is simply not the case—no such undisputed evidence exists. We thus conclude that any possible error in the district court's instruction in this case was harmless in light of the overwhelming evidence against Wilk and the comprehensive self-defense instruction given by the court. Unlike in *Danehy* and *Young*, the district court thoroughly instructed the jury on Wilk's self-defense claim, which permitted the jury to consider and decide whether Wilk

18

believed that he was defending himself against unknown intruders. *See Young*, 464 F.2d at 163 (concluding that a portion of the erroneous jury instruction was broad enough to permit the jury to find the defendant guilty of the charged offenses even if the jury believed the defendant's testimony that he thought he was being harassed by "local rowdies"). The jury considered Wilk's legal excuse for his conduct and rejected it, and he fails to convince us that a different outcome would have resulted from the elimination of the "or had reason to know" language.

### III. CONCLUSION

We find no reversible error in the district court's resolution of the evidentiary issues or in its instructions to the jury. As for the remaining issues that Wilk raised before this Court, we also find no reversible error. Accordingly, we affirm.

**AFFIRMED**.