[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-10210
Non-Argument Calendar
_____

D.C. Docket No. 3:16-cr-00061-BJD-MCR-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JUSTIN G. PENNINGTON,
a.k.a. David Anderson,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(February 20, 2019)

Before WILSON, WILLIAM PRYOR and HULL, Circuit Judges.

PER CURIAM:

Justin Pennington appeals his convictions and sentence of 65 months of imprisonment for one count of conspiring to commit wire fraud, 18 U.S.C. § 1349, and nine counts of wire fraud, *id.* § 1343. Pennington challenges the exclusion of evidence that his victims purported to create a fictitious business after he committed the charged offenses. Pennington also challenges the calculation of his amount of loss. We affirm.

## I. BACKGROUND

Stephen and Mary Height owned The Wholesale House, which sold consumer electronic goods to retail businesses. Pennington developed a computer system for Wholesale House and later served as its director of information technology. The Heights hired Marcelene Keesbury as an accountant and Charles French as a salesman and promoted them, respectively, to president and vice president of Wholesale House. When the Heights decided to retire, they gave Keesbury a general power of attorney to manage the company.

In 2010, Pennington formed with Keesbury and French an online business named 3 Kings to compete clandestinely with customers of Wholesale House. With French's assistance, Pennington restructured his employment contract to eliminate issues with its noncompetition clause. Pennington incorporated 3 Kings in Delaware and used the pseudonym David Anderson to list himself as the registered agent. Pennington controlled the bank accounts for 3 Kings.

2

French and Keesbury exploited their positions of authority to ensure that 3 Kings received an unusually large line of credit and discounted prices on electronic goods, that it received twice as much time as other customers to pay invoices, and that it returned damaged goods without incurring penalties. Their actions resulted in 3 Kings purchasing goods at prices lower than Wholesale House needed to cover its costs. After 3 Kings launched its online sales of goods at significantly cheaper prices, competitors began to question its connection to Wholesale House.

Pennington used his technical experience to conceal information about 3 Kings and to hide its debt. He routed the company website through a remote server and reported that information technology services were provided by a shell consulting firm. He accessed the computer systems of Wholesale House remotely, blocked its sales employees from accessing the 3 Kings account, and screened employees' emails for references to 3 Kings. He also added fictitious companies to the accounts receivable ledgers of Wholesale House and posted some of the debt owed by 3 Kings to the accounts of the fictitious companies.

3 Kings used Wholesale House to cover its losses. The Heights had operated Wholesale House using only a small line of credit, but in 2011, Keesbury obtained a line of credit of $525,000 in the Heights' names. As 3 Kings failed to pay its invoices, Keesbury surreptitiously increased the borrowing limit on the line of credit to $5 million. Keesbury also instructed staff of Wholesale House to re-date

past due invoices for 3 Kings. In December 2013, 3 Kings owed $5 million of the $6.7 million that Wholesale House had in outstanding invoices.

Customers and suppliers began to snub Wholesale House. For example, sales to one key customer between 2011 and 2013 decreased from $8 million to $66,000. Wholesale House also experienced plummeting profit margins and a decrease in front-end discounts and vendor incentive rebates.

Notwithstanding the debt of 3 Kings, Pennington distributed by electronic fund transfer about $40,000 monthly to himself, Keesbury, and French. Pennington also withdrew $1 million from 3 Kings to pay his personal debt, which included in two consecutive months in 2013 expenditures of $70,000 in London, Paris, and Los Vegas, and more than $50,000 in New York City. Of the $4,578,459 that 3 Kings disbursed, Pennington received $2,231,505, while Keesbury and French each received $1,173,477.

3 Kings briefly hid its owners' identities and finances after the Heights discovered its massive debt in December 2013. Pennington produced false financial statements for 3 Kings that French delivered to the Heights. In early March 2014, Pennington falsely disclosed to the Heights that he was working for David Anderson at 3 Kings. But later that month, Pennington, Keesbury, and French admitted to the Heights that they owned 3 Kings and could not pay Wholesale House.

4

Stephen Height attempted without success to pressure Pennington to pay Wholesale House for the debt owed by 3 Kings. Stephen purported to create a fictitious business, which he named Five Aces, and he designed a web page on a private server that portrayed the business as a promising competitor to 3 Kings. Stephen sent the web page to Pennington and boasted that Five Aces would surpass 3 Kings in sales. When Stephen's plan failed to cause Pennington to pay the debt, Wholesale House closed the 3 Kings account.

After 3 Kings failed, the Heights liquidated personal assets to pay off the line of credit for Wholesale House. After information about 3 Kings became public, some manufacturers refused to sell to Wholesale House, and it lost many major customers who thought that Stephen had been involved in 3 Kings. Keesbury and French pleaded guilty to conspiring to commit wire fraud.

After Pennington entered pleas of not guilty to the charges for conspiracy and for nine counts of wire fraud, he announced his intention to introduce evidence regarding Five Aces. The government moved *in limine* to exclude the evidence. Pennington argued that the evidence was "critically important" to establish that he lacked "any intent to defraud" and to establish that Stephen Height "caused the loss of $4.5 million to the Wholesale House" by refusing to allow 3 Kings to pay off its "ordinary business debt." The district court granted the motion of the government.

Pennington moved unsuccessfully during trial for the district court to reconsider its ruling.

The jury found Pennington guilty of all ten offenses, and his presentence investigation report held him responsible for a loss of $4,576,969, which subjected him to an 18-level enhancement of his base offense level. *See United States Sentencing Guidelines Manual* § 2B1.1(b)(1)(J)–(K) (Nov. 2016). Pennington objected and argued that the amount of loss should equal the actual net loss to Wholesale House, which he contended was zero.

At sentencing, Pennington called Scott Steadman, an expert witness in forensic accounting. Steadman testified that he could calculate the loss to Wholesale House based on its estimated profit. Steadman estimated that, between 2010 and 2014, Wholesale House made $3.6 million in its transactions with 3 Kings and benefitted between $700,000 and $1 million from economies of scale. Steadman stated on cross-examination that the net profits of Wholesale House did not include accounts receivable and that it was a coincidence that the disbursements of 3 Kings to Pennington, French, and Keesbury roughly equaled its indebtedness to Wholesale House. Steadman opined that the disbursements by 3 Kings did not provide an accurate measure of loss because those payouts included comingled funds from Wholesale House and other businesses. Later, Steadman opined that the favorable terms Wholesale House negotiated with account vendors

increased the profit margin it made on the goods sold to 3 Kings and that economies of scale resulted in Wholesale House operating at a profit margin of 14 to 15 percent. Steadman blamed the losses of Wholesale House on the Heights' practice of disbursing company profits and loaning those monies back to the company.

Robert Weatherhead, the chief financial officer of Wholesale House, testified that the low profit margin devised by 3 Kings left Wholesale House unable to cover its costs, as evidenced by its fiscal downturn in 2013 when its leading customer was 3 Kings. Weatherhead explained that Wholesale House wrote off $4.6 million of invoices 3 Kings never paid and that its owners' actions also caused millions of dollars in damage to the goodwill of Wholesale House.

The district court overruled Pennington's objection to the amount of loss and enhanced his base offense level by 18 levels. The district court declined to credit Steadman's testimony that Wholesale House profited from its relationship with 3 Kings because he failed to consider the loss of goodwill that Wholesale House suffered with its other customers. The district court found that the government had "offered evidence that 3 Kings had over $4.6 million of bad debt written off by The Wholesale House, which means there was a corresponding and unauthorized extension of credit of at least $4.075 million."

The district court adopted the calculations in Pennington's presentence report, which resulted in an advisory guideline range of 108 to 135 months of imprisonment, but it varied downward 43 months below the low end of his sentencing range based on the statutory sentencing factors, 18 U.S.C. § 3553. The district court explained that Pennington faced a sentence "over 2.5 times that of his co-defendants" yet "all defendants exercised considerable discretion and played a substantial role in the offense" and that a lesser sentence would make it "more likely that he [would] be able to repay more of the losses his criminal conduct . . . caused . . . ." The district court sentenced Pennington to 65 months of imprisonment.

## II. STANDARDS OF REVIEW

We apply two standards of review in this appeal. We review for abuse of discretion a decision to exclude evidence. *United States v. Barsoum*, 763 F.3d 1321, 1338 (11th Cir. 2014). We review the calculation of the amount of loss under the Sentencing Guidelines for clear error. *United States v. Baldwin*, 774 F.3d 711, 727 (11th Cir. 2014).

## III. DISCUSSION

Pennington raises two challenges to his conviction and sentence. First, Pennington argues that the exclusion of evidence regarding Five Aces violated his right to a fair trial because, had the jury heard the evidence, it likely would have

8

found that he lacked the intent to defraud Wholesale House and that Stephen caused the losses to his company. Second, Pennington argues that no evidence established that 3 Kings misused its line of credit and that his expert witness provided a more accurate assessment of the amount of loss.

The district court did not abuse its discretion when it excluded the evidence regarding Five Aces. Stephen Height's purported creation of a fictitious company was irrelevant to the determination whether Pennington intended to defraud Wholesale House. *See* Fed. R. Evid. 401; *see United States v. Wilk*, 572 F.3d 1229, 1234–35 (11th Cir. 2009). The unsuccessful acts that Stephen undertook to mitigate the damage that 3 Kings inflicted on Wholesale House for four years had no bearing on Pennington's state of mind when he formed and operated 3 Kings. Pennington sought to admit Stephen's actions as evidence that he intended to appropriate or supplant 3 Kings and that his abandonment of that plan left Wholesale House insolvent, but Pennington offered no cogent explanation of how Stephen's marketing of a fictional entity to Pennington caused the economic losses of Wholesale House. *See United States v. Machado*, 886 F.3d 1070, 1085 (11th Cir. 2018). In any event, the evidence regarding Five Aces would have confused the jury and distracted it from the central issue of whether Pennington conspired to profit from exploiting the capital and assets of Wholesale House. *See* Fed. R. Evid. 403.

9

Exclusion of the evidence regarding Five Aces did not prevent Pennington from informing the jury of his theories of defense. During his opening and closing statements, Pennington argued that he did not intend to defraud Wholesale House and that its loss was attributable to Stephen refusing to sell goods to 3 Kings. French, Keesbury, and Pennington testified that they never intended to harm Wholesale House. Pennington also testified that he thought 3 Kings would benefit Wholesale House; that he formed 3 Kings clandestinely to conceal French's and Keesbury's involvement in the company; and that French handled the company finances, approved all the disbursements by 3 Kings, and failed to reveal its debt to Pennington until mid-2013. *See Wilk*, 572 F.3d at 1234 (rejecting defendant's argument that he was unable to present his version of events to the jury when he testified in his defense). And Pennington testified that he, French, and Keesbury planned to expand 3 Kings to satisfy its debt and that Stephen "destroyed" 3 Kings by preventing it from paying its debt to Wholesale House. Pennington was given a fair opportunity to present his defense.

The district court also did not clearly err in finding that Pennington intended to inflict a loss of more than $3.5 million. Loss can be estimated using the loss incurred by the victim. *United States v. Bradley*, 644 F.3d 1213, 1289 (11th Cir. 2011). Weatherhead testified that Wholesale House had to write off $4.6 million for invoices 3 Kings never paid, and the district court reduced that loss amount by

the $525,000 initial line of credit that Keesbury obtained in the Heights' names. *See United States v. Patterson*, 595 F.3d 1324, 1327 (11th Cir. 2010) ("the proper punishment for a defendant's fraud . . . [is] the reasonable mathematical limit of his scheme"). The government established that Keesbury's periodic increases of the line of credit for Wholesale House were inconsistent with its normal business operations and were instead related to its increased business with and debts owed by 3 Kings. And Keesbury testified that she "abused" her authority by increasing the line of credit to conceal the debt of 3 Kings. The district court credited reliable and specific evidence to hold Pennington responsible for $4.075 million in debt that 3 Kings owed Wholesale House.

We cannot say the district court clearly erred in finding that Steadman underestimated the loss 3 Kings caused Wholesale House. Steadman failed to account for the decrease in Wholesale House profits that corresponded with its increased sales to 3 Kings. Steadman also overlooked the substantial losses attributable to the termination of contracts by customers and suppliers.

## IV. CONCLUSION

We **AFFIRM** Pennington's convictions and sentence.

11