[DO NOT PUBLISH]

# In the
# United States Court of Appeals
## For the Eleventh Circuit

_____

No. 23-10617

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

ESTEBAN ROBERTO ORTIZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 2:21-cr-00353-SLB-NAD-3

_____

Before WILLIAM PRYOR, Chief Judge, and JILL PRYOR and BRANCH, Circuit Judges.

PER CURIAM:

Esteban Ortiz appeals his convictions for conspiring to possess with intent to distribute 500 grams or more of methamphetamine and an amount of marijuana. 21 U.S.C. §§ 846, 841(a)(1). Ortiz challenges the admission of out-of-court statements by individuals who he argues were not proven to be co-conspirators, Fed. R. Evid. 801(d)(2)(E), and text messages and photographs sent between him and unidentified declarants as irrelevant, unfairly prejudicial, and "other acts" evidence, *id.* 402, 403, 404(b). We affirm.

A grand jury charged Ortiz with conspiring to possess with intent to distribute 500 grams or more of methamphetamine and an amount of marijuana. 21 U.S.C. §§ 846, 841(a)(1). The grand jury charged Loreddie Rodriguez Alverado and Ramiro Davila Renteria as co-conspirators and alleged that the conspiracy began in September and continued through October 5, 2021.

Before trial, Ortiz filed two motions *in limine*. In the first motion, he sought to exclude text messages and photographs sent between him and Alverado and between him and unidentified declarants as inadmissible hearsay and as irrelevant and unfairly prejudicial. In the second motion, he sought to suppress anticipated hearsay testimony from Alverado about statements that her former boyfriend, Renteria, made because Renteria had absconded and the United States could not establish that he was a co-conspirator. Fed.

R. Evid. 801(d)(2)(E). The district court denied the motion as to Alverado's anticipated testimony but stated that it would rule on its admissibility at trial if Ortiz objected to it then. The district court reserved ruling on the admissibility of the text messages.

At trial, an agent with the Oklahoma Bureau of Narcotics testified that on October 4, 2021, he stopped a car in Oklahoma for a traffic violation. Renteria was driving the car, and Alverado was a passenger. Renteria consented to a search of the car, and the agent found a hidden compartment in the trunk containing 11 pounds of methamphetamine and four pounds of marijuana. Renteria and Alverado, who were driving from California to Alabama, agreed to cooperate with law enforcement and agents of the Drug Enforcement Administration. An agent with the Administration testified that he coordinated with other Administration agents in Birmingham to transport Renteria, Alverado, the car, and the drugs to Alabama, where they staged a controlled delivery of the drugs.

Alverado testified that she met her boyfriend, Renteria, while living in California. Ortiz was her landlord. After she fell behind on rent and her car became inoperable, Ortiz loaned her a car, told her to drive the car to Alabama, and said that he would evict her if she did not make the trip for him. The government introduced Exhibit 22 containing text messages between Alverado and Ortiz. Ortiz did not object. Alverado explained that Ortiz's text message to her on October 1, 2021—"[t]ry to put that in the carrots"—referred to him placing a tracker on the car key chain so that

he could track the car. She and Renteria began their trip to Alabama on October 3, and the next day, Ortiz sent her the address for the meeting place. Before Oklahoma police stopped them, Renteria told her that if they were stopped by police, she should not mention Ortiz and should deny knowing about the drugs. She testified that she knew that she would be transporting something illegal, most likely drugs, but she did not know what type of drugs. Referring to Exhibit 22, Alverado explained that Ortiz texted her a new Alabama address after police stopped her. Both she and Renteria used her phone to communicate with Ortiz. One text message from the phone they used told Ortiz, "Give me a minute the police stopped us." Alverado testified that after they stopped, Ortiz texted her, "[M]ake sure that you're not being followed." She called Ortiz by the nickname "Borrego" or "Borre." On cross-examination, Alverado testified that she did not know that drugs were in the car until Renteria told her, and he told her about the drugs before the police stopped them.

After the United States moved to admit text messages recovered from Ortiz's cell phone and have law enforcement testify to the contents of the messages, Ortiz objected. Outside the jury's presence, the district court spent two hours addressing the proposed text messages line-by-line, ruling on which portions of the text messages were admissible. It instructed the prosecutor to ask only about the specific text messages that it found admissible and advised Ortiz that his objections would be treated as standing objections that he was not required to renew before the jury. An Administration expert in narcotics investigation, methodology, and

jargon testified that "bottle" and "soap" were slang terms for meth, that "puppy food" was slang for heroin, and that "shoes" was slang for marijuana.

The challenged text messages were presented in Exhibits 23, 24, 26, 28, 29, 31, 33, 34, and 36 through the testimony of Michael Paul, an Administration agent. Paul testified regarding the controlled delivery, which was audio and video recorded. Paul explained that the couple told Ortiz that their car broke down in a parking lot in Alabama, and Ortiz and a friend arrived to repair the car. Ortiz looked inside the trunk of the car several times and pulled back the carpet that concealed the hidden drug compartment. Agents arrested Ortiz and searched his vehicle, recovering a cell phone on the driver's side where he was sitting. Although Ortiz denied that the cell phone was his, the agent called the phone number that Alverado used to communicate with Ortiz, and the agent's number displayed on the recovered phone.

Paul testified that Exhibit 22 contained text messages between Ortiz and Alverado, including Ortiz's instruction to "make sure" that they were not being followed. Exhibits 23, 24, and 26 contained text messages that Ortiz received from individuals called "Home Girl," "Tim#2," and "Mar," respectively, and ranged from September 4 to October 5, 2021. Regarding Exhibit 23, on September 4, Ortiz messaged "Home Girl," "[Y]ou got some that needs some bottle." "Home Girl" asked, "[W]hat do we get for bringing you the car? Keep it simple, I can just tell her to go ahead and go to Alabama and get herself home . . . ." The texts between Ortiz and

"Home Girl" discussed arrangements for travel expenses, such as "Home Girl" asking that Ortiz "give [her] 2lbs" to cover expenses, but when Ortiz declined, "Home Girl" responded, "I am done with you the car the soap the complete waste of time." A later text message from "Home Girl" stated, "Simple negotiation. Black puppy n 1 pound of puppy food." On September 18, Ortiz mentioned "[t]rying to get a different kind of shoes."

Regarding Exhibit 24, on September 22, "Tim#2" messaged Ortiz that he "needed 2 bottles by Friday." The next day "Tim#2" said that he had "over half the bill money but the longer it takes to pay them the more the price goes up" and "I can make the rest of those bottles I need you here bro I finally got it where I can make us money." On September 30, "Tim#2" messaged Ortiz, "[I] seriously don't know what else to do I finally got a place to take the bottles but we ain't got no bottles so that does me no good." Paul identified a photograph sent from "Tim#2" to Ortiz as a picture of Ortiz with the caption, "Bruh, you was wildin last night." And regarding Exhibit 26, on October 4, Ortiz messaged an individual he knew as "Mar" and said, "They got stopped."

Paul further testified that Exhibit 28 contained text messages from Ortiz to an unidentified person on October 3, the day before the traffic stop, stating that he had "something good" and had arrived in Alabama. Exhibit 29 contained text messages from someone Ortiz knew as "Gorda," who sent Ortiz 18 photographs of marijuana between September 23 and October 4, and Ortiz responded, "But the prices." Exhibit 31 contained text messages from

Ortiz to an unknown individual whom Ortiz told on September 6, "Just so you know I'm going your way so you can have the three and how many bottles you want 'ready so I can just keep pushing."

Exhibit 33 contained text messages from Ortiz to another unknown individual, instructing the individual on September 7 to put "Mario Castillo" in the bill of sale for a 2014 Nissan Sentra, which was the vehicle that Alverado and Renteria were driving when they were stopped in Oklahoma. The unknown individual sent Ortiz a picture of the bill of sale listing "Mario Castillo" as the registered owner.

Exhibit 34 contained a text message from Ortiz to an individual he called "Bill Colecter" and attached an image of a handwritten note. Exhibit 36 contained a certified translation of the handwritten note, stating:

> I, Borrego am sending here to the people who are present to pick up the money that was sent to them so they can send the work to Toyo (Guero). You were sent $26,000 for bottles, as well as $10,000 that he helped to pick up. So the total es $36,000 dollars that I need you to give me so I can give the things to the people whom the money belongs to.

Ortiz moved for a judgment of acquittal and argued that insufficient evidence established the existence of a conspiracy. The district court denied the motion, and the jury found Ortiz guilty. Ortiz again moved for a judgment of acquittal and for a new trial on largely the same grounds. The district court denied the motion.

It sentenced Ortiz to a below-guidelines sentence of 300 months of imprisonment and 60 months of supervised release.

We review evidentiary rulings for abuse of discretion. *United States v. Wilk*, 572 F.3d 1229, 1234 (11th Cir. 2009). When a non-constitutional error occurs in a criminal case, we review the error for harmlessness. *United States v. Sweat*, 555 F.3d 1364, 1367 (11th Cir. 2009). The government meets its burden of establishing that the alleged error was harmless when, viewing the trial record in its entirety, we are convinced that "the error did not affect the verdict or had but very slight effect." *Id.*

Ortiz argues that the district court abused its discretion by admitting out-of-court statements by the charged co-conspirators and the unidentified individuals with whom Ortiz communicated by text message because insufficient evidence stablished that they formed a conspiracy. Fed. R. Evid. 801(d)(2)(E). Specifically, he challenges the admission of Exhibits 22, 23, 24, and 26—the text messages between him and Alverado, "Home Girl," "Tim#2," and "Mar," respectively—and Alverado's testimony that Renteria told her before they were stopped by police not to mention Ortiz or the drugs. He argues that to be admissible under Rule 801(d)(2)(E), the government must present evidence other than a co-conspirator's statement to establish that a conspiracy existed.

Rule 801(d)(2)(E) provides that a co-conspirator's out-of-court statement made during and in furtherance of the conspiracy is not hearsay and can be offered against the defendant for the truth of the matter asserted. Fed. R. Evid. 801(d)(2)(E). Before

the co-conspirator's statement can be admitted, the government must prove by a preponderance of the evidence that a conspiracy existed, the conspiracy included the declarant and the defendant against whom the statement is offered, and the declarant made the statement during and in furtherance of the conspiracy. *United States v. Christopher*, 923 F.2d 1545, 1549–50 (11th Cir. 1991). In determining whether a statement was made in furtherance of a conspiracy, we apply a "liberal standard" and will not reverse that finding by a district court unless it is clearly erroneous. *United States v. Santiago*, 837 F.2d 1545, 1549 (11th Cir. 1988); *United States v. Garcia*, 13 F.3d 1464, 1473 (11th Cir. 1994).

The district court did not abuse its discretion by admitting Renteria's out-of-court statements to Alverado. The statements were admissible as non-hearsay under Rule 801(d)(2)E) because a preponderance of the evidence established that Renteria and Alverado conspired with Ortiz to distribute a controlled substance. *See Christopher*, 923 F.2d at 1549–50. Renteria told Alverado on the day they left California that there were drugs in the car, not to mention Ortiz, and to deny knowing about the drugs if they were stopped by police during their trip, and police seized 11 pounds of methamphetamine and four pounds of marijuana from the trunk of the car that Renteria was driving. *See id.*

The district court did not err by admitting the text messages between Alverado and Ortiz contained in Exhibit 22. The government presented ample evidence of a conspiracy between Ortiz and Alverado. Alverado testified that although she initially did not

know what illegal item Ortiz wanted her to transport to Alabama, she believed that it probably was drugs. *See United States v. Gomez*, 905 F.2d 1513, 1514 (11th Cir. 1990) (explaining that knowledge of the particular drug involved need not be proven so long as the individual knew she was dealing with a controlled substance). She also testified that Renteria told her before the police stopped them that there were drugs in the car, and she did not withdraw from the conspiracy after Renteria confirmed that the car was loaded with drugs. The statements in the text messages between her and Ortiz were sent during the charged conspiracy and revealed that she and Ortiz communicated about the traffic stop and the importance of making sure that no one followed her.

Even if we assumed that the district court abused its discretion by admitting the text messages between Ortiz and unidentified declarants "Home Girl," "Tim#2," and "Mar" in Exhibits 23, 24, and 26, any error was harmless because the evidence overwhelmingly established that Ortiz conspired with at least one other individual to distribute a controlled substance. *See* 21 U.S.C. § 846; *United States v. Fortenberry*, 971 F.2d 717, 722 (11th Cir. 1992) ("[E]rroneous admission of evidence does not warrant reversal if the purported error had no substantial influence on the outcome and sufficient evidence uninfected by error supports the verdict."). After agents stopped Alverado and Renteria and seized 11 pounds of methamphetamine and four pounds of marijuana from the car they were driving, they arranged a controlled delivery near the original delivery address. After the couple communicated to Ortiz that they were stopped by police, Ortiz changed the delivery

address and told them to make sure they were not being followed. After they arrived in Alabama, the couple told Ortiz that their car broke down, and Ortiz arrived shortly after and inspected the hidden compartment that contained the drugs. An agent confirmed that the phone in the driver's seat where Ortiz sat rang when the agent dialed the number that Alverado and Renteria used to communicate with him. Alverado also testified that Ortiz loaned her the car and threatened to evict her if she did not make the cross-country trip, and she believed that she probably was transporting illegal drugs for Ortiz. In the light of the strong evidence that Ortiz participated in a conspiracy to distribute a controlled substance, the admission of text messages with the three unidentified declarants, all of which occurred during the charged conspiracy and involved coded drug language or referred to the police stopping Alverado and Renteria, was harmless. *See Fortenberry*, 971 F.2d at 722.

Ortiz argues that the text message thread containing 18 photographs sent to him by an unidentified declarant, "Gorda," constituted improperly noticed extrinsic evidence of "other acts," Fed. R. Evid. 404(b), and was prejudicial, *id*. 403. But because a reasonable jury easily could find from the other evidence that Ortiz conspired to distribute the four pounds of marijuana seized from the hidden compartment in the car, we need not decide whether the messages were admitted in error. *See Fortenberry*, 971 F.2d at 722.

Ortiz also argues that the district court abused its discretion by admitting the text messages between him and all unidentified

declarants—"Home Girl," "Tim#2," "Mar," "Gorda," "Bill Co-lecter," and three others as presented in Exhibits 23, 24, 26, 28, 29, 31, 33, 34, and 36—because the text messages and photographs were irrelevant. *See* Fed. R. Evid. 401. He argues that even if some of the text messages were relevant because they contained coded drug language, the probative value of those messages was substantially outweighed by the danger of unfair prejudice. *See id.* 403.

Regardless of whether the district court abused its discretion by admitting the text messages from unidentified declarants on hearsay grounds, *id.* 801(d)(2)(E), the text messages were relevant and not unfairly prejudicial, *see id.* 401, 403. Ortiz's text messages with "Home Girl" revealed that he was planning for someone to travel by car to Alabama and referenced "bottle" and "soap," which the narcotics jargon expert explained were coded language for methamphetamine. The text messages from "Tim#2" referenced needing two "bottles" from Ortiz and having "bill money." Ortiz texted Mar, "They got stopped," after agents stopped Alverado and Renteria. Ortiz's text message to the unidentified declarant in Exhibit 28 was relevant because his statement that he had "something good" the day that Alverado and Renteria began their trip to Alabama suggested that Ortiz knew about their trip and the drugs they were carrying. Ortiz's note to "Bill Colecter," discussing $26,000 owed for "bottles" was relevant to deciding whether Ortiz was involved in distributing large quantities of drugs. Ortiz's text message regarding the bill of sale for the Nissan also was relevant because he instructed that the bill of sale for the car that he loaned Alverado and Renteria for their trip be registered under a different name,

further implicating him in the conspiracy. Nevertheless, even if Ortiz could establish that the text messages were insufficiently relevant or probative, we conclude that but for the alleged error, the outcome of his trial would not have been different. *See Sweat*, 555 F.3d at 1367.

We **AFFIRM** Ortiz's convictions and sentence.